KEYSTONE SHIPPING CO., et al.

v.

MASTERS, MATES & PILOTS PENSION PLAN, Masters, Mates & Pilots Vacation Plan

v.

Adolph B. KURZ, Karl R. Kurz and P.W.J. Fisher.

Civ. A. No. N–85–2977.

United States District Court, D. Maryland.

Oct. 13, 1987.

William R. Dorsey, III, Bruce E. Alexander, and Semmes, Bowen & Semmes, Baltimore, Md., and Carl L. Taylor, Betty S. Wommack, and Kirkland & Ellis, Washington, D.C., for plaintiffs.

Stanley M. Berman, and Cohen, Weiss & Simon, New York City, for defendant MM & P Pension Plan.

Seymour M. Waldman, and Vladeck, Waldman, Elias & Engelhard, New York City, for defendants MM & P Health & Benefit Plan and MM & P Vacation Plan.

W. Michel Pierson, and Pierson & Pierson, Baltimore, Md., for defendants.

William R. Dorsey, III, and Semmes, Bowen & Semmes, Baltimore, Md., for third-party defendants.

## MEMORANDUM

NORTHROP, Senior District Judge.

Plaintiffs in this case, Keystone Shipping Company, et al. ("Keystone"), are former parties to successive collective bargaining agreements entered into with the International Organization of Masters, Mates and Pilots ("IOMM & P). Defendants are multi-employer employee benefit plans ("the plans"), established by the collective bargaining agreements, which are maintained pursuant to Section 302(c)(5) of the Taft–Hartley Act, 29 U.S.C. § 186(c)(5), and the Employee Retirement Income Security Act, as amended, 29 U.S.C. § 1001(a) *et seq.*

This case arose over a dispute between Keystone and the Plans as to Keystone's liability for certain contributions assessed by the Plans following Keystone's decision to terminate its collective bargaining agreement with IOMM & P.[1] Presently before the Court is a motion filed by defendant Masters, Mates & Pilots Pension Plan ("Pension Plan") seeking an order compelling arbitration of Keystone's disputed obligation to pay one of these assessments,

---

1. The Pension Plan sought to collect two sums from Keystone. First, the Plan contends that Keystone has a statutory obligation to pay a proportionate share of the Plan's liability for unfunded vested pension benefits ("withdrawal liability"). Second, the Plan asserts that, under the terms of the collective bargaining agreement for the period 1981–1984, plaintiffs are responsible for payment of a proportionate share of the difference between the Pension Plan's actual costs and the monthly contributions received by the Plan during the term of that agreement ("shortfall liability").

namely, shortfall liability. Keystone has opposed the motion, contending that the shortfall issue should be decided in the judicial forum.[2]

After careful review of the pleadings submitted by the parties, the Court finds that no hearing is necessary. Local Rule 6. For the reasons stated herein, the Pension Plan's motion to compel arbitration will be granted.

Effective June 16, 1981, Keystone entered into a collective bargaining agreement, for the period 1981–1984 ("the 1981 agreement"), with IOMM & P covering conditions of employment for liscensed deck officers. By virtue of this agreement, Keystone obligated itself to make certain annual contributions to the Pension Plan to fund pension benefits. In section XXIX(B)(2) of the 1981 agreement, Keystone agreed to make such payments "in whatever amounts are necessary to meet each year the total annual actuarial costs for the benefits...." Section XXIX(B)(14) further described Keystone's duty, providing that "the Company agrees that the industry's obligation for the period June 16, 1981 to June 15, 1984 shall be 24% of wages and non-watch allowance and that the minimum obligation shall be based on 1,100,000 days."

The bargaining agreement contained two provisions relating to arbitral resolution of potential contract disputes. Section XXXVI, captioned "Grievance Procedure and Arbitration," provided, at paragraph one, that:

[a]ll disputes relating to the interpretation or performance of this Agreement which may arise between the Parties to this Agreement shall be determined by a Liscensed Personnel Board consisting of two persons appointed by the Organization and two persons appointed by the Company....

In the event no settlement is reached by the Board, the issue may be referred to the Arbitrator by either Party for arbitration. The cost of arbitration shall be borne equally by the Organization and the Company involved.

A second paragraph, dealing specifically with pension plan contributions, stated, at section XXIX(B)(5):

[t]here shall be no unilateral change in contribution rates or actuarial assumptions. Contribution rates and actuarial assumptions may be changed only by mutual agreement or by award of the Arbitrator.

After the effective date of the 1981 agreement, the Pension Plan Trustees required Keystone, along with other contributing employers, to make monthly pension plan contributions based upon the 24% of "wages and non-watch allowance" specified in section XXIX(B)(14). Despite payment of these sums, at meetings in May and October 1983, the Pension Plan trustees were advised by the Plan actuaries that projected actuarial requirements for the term of the 1981 agreement, July 1, 1981 to June 20, 1984, would result in a deficit compared with the projected contributions for the period. The actuaries estimated that this deficit, or "shortfall," which was attributed to a decline in total payroll, would total approximately 17.5 million dollars. Upon being advised of the shortfall, the trustees deadlocked over a request that the Actuaries develop a contribution rate increase to address the shortfall.

At the May 1984 Board of Trustees meeting, the plan Actuaries informed the Pension Plan Trustees that the previously identified shortfall had not abated. In considering ways to address this shortfall, the Trustees were unable to agree upon a resolution calling for an assessment of allocated shares of shortfall liability among all employers, and immediate payment by any employer withdrawing from participation in the pension plan of its proportionate share.

Shortly following expiration of the 1981 agreement, on September 27, 1984, Key-

---

**2.** Prior to submission of the Pension Plan's motion to compel arbitration, Keystone filed a motion for summary judgment on the shortfall liability issue. In a memorandum and Order dated November 12, 1986, this Court stayed consideration of the merits of the shortfall liability question, pending a determination of the Pension Plan's motion to compel arbitration of that very issue.

stone informed IOMM & P that it was terminating its relationship with the union. At the next Board of Trustees meeting, in October 1984, the Trustees voted unanimously to assess employers, such as Keystone, who had permanently withdrawn from the pension plan, allocable shares of the 1981–84 shortfall. At the end of February 1985, Keystone received a letter informing the company of the Trustees' action and demanding payment of $1,060,000, its shortfall share.[3]

Keystone declined to tender payment of the shortfall assessment. Instead, on July 12, 1985, Keystone filed suit in this Court against the Pension Plan, seeking, *inter alia,* a declaration that the companies were not obligated to pay the requested sum, on the grounds that the assessment was prohibited by both federal law and the 1981 agreement.

Responding to Keystone's complaint, in February 1985, the Pension Plan filed an answer and counterclaim contending that the 1981 agreement required Keystone to submit its dispute concerning the validity of the shortfall assessment under that agreement to arbitration.[4] Alternatively, the plan sought judgment in the amount of the shortfall assessment. By letter dated May 12, 1986, the Pension Plan informed Keystone that, pursuant to the 1981 agreement, it was requesting arbitration of the shortfall dispute.

Based upon these facts, this Court must now consider whether the 1981 agreement requires arbitration of the contractual aspect of the shortfall liability dispute. Several well-established precepts concerning a motion to compel arbitration shape the Court's role in confronting this question. First, it is hornbook law that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to so arbitrate." *AT & T Tech., Inc. v. Communica-*

*tions Workers,* 475 U.S. 643, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986), quoting *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 40 L.Ed.2d 1409 (1960). Second, the question of whether a contract mandates the submission of an issue to arbitration is subject to judicial resolution, unless the parties clearly provide otherwise. *AT & T Tech., Inc.,* 106 S.Ct. at 1418–19. Third, in determining whether a dispute must be arbitrated, a court should not rule on the merits of the underlying claim. *Id.* at 1419.

With these principles in mind, the Court turns to the case at bar. In its motion to compel arbitration, the Pension Plan argues that sections XXXVI and XXIX(B)(5) of the 1981 agreement clearly dictate that issues concerning the validity of shortfall liability assessments under that agreement be submitted to arbitration. Keystone opposes the motion on two major grounds. First, the company asserts that, because the 1981 agreement was no longer in effect at the time shortfall liability was actually assessed, Keystone is not subject to any duty to arbitrate arising from that agreement. Second, Keystone contends that, even if the contract did create a duty to arbitrate post-termination disputes concerning shortfall liability, such duty was excused by the Pension Plan's failure to seek arbitration in a timely fashion.

Before considering Keystone's arguments in opposition, as a threshold matter, the Court must determine whether the shortfall dispute itself is covered by the arbitration clauses in the 1981 agreement. If this issue is arbitrable under the agreement, the Court will then go on to consider whether a post-termination dispute as to this issue is similarly covered.

The Pension Plan relies directly upon the unambiguous language of sections XXXVI and XXIX(B)(5) to support arbitrability of

---

**3.** This figure was subsequently recalculated using a different methodology. This revised estimate, which was approved by the Trustees in March 1986, set Keystone's share at $1,281,832.

**4.** The Pension Plan's motion to compel seeks arbitration of the contractual aspect of the

shortfall dispute, i.e., the validity of the assessment under the 1981 agreement. Arbitration has not been sought to resolve the validity of the shortfall assessment under federal law, an issue which has been raised by Keystone.

the shortfall dispute. At first glance, section XXXVI, which provides for arbitration of "all disputes relating to the interpretation or performance of this agreement which may arise between the Parties to this Agreement ...," appears to mandate arbitration. While not expressing any opinion as to the merits of the issue, the Court notes that the shortfall dispute centers on the parties' conflicting interpretation of the interrelationship between the two provisions of the 1981 agreement which establish an employer's contribution obligation to the Pension Plan, sections XXIX(B)(2) and XXIX(B)(14). As Keystone correctly points out, however, a reading of the preamble to the 1981 agreement belies a finding of arbitration on the strength of section XXXVI.

According to the preamble to the agreement, the parties to the 1981 agreement are: "the International Organization of Masters, Mates and Pilots, AFL–CIO (herein the "Organization" or "Union") and those associations and/or companies listed (herein "the Company")...." Since the Pension Plan is not a party to the 1981 agreement, section XXXVI, which applies to disputes arising "between the Parties to the Agreement" only, has no applicability here. The Court's interpretation of this provision is bolstered by a further reading of section XXXVI which provides that the costs of arbitration under that section are to be borne equally by "the Organization", i.e., IOMM & P, and "the Company", i.e., one of the associations and/or companies listed in the Preamble. In the absence of any mention of the Pension Plan or its Board of Trustees, the Court holds that section XXXVI was intended to serve as a vehicle for resolving union-employer disputes only.

In contrast to the general language of section XXXVI, XXIX(B)(5) specifically deals with disputes concerning pension plan contributions. The section provides that, in the absence of "mutual agreement," changes in contribution rates are to be made "by an award of the Arbitrator." Unlike section XXXVI, section XXIX anticipates the Pension Plan's participation in this arbitration process. Significantly, section XXIX(C)(6) provides that "all incurred expenses of any arbitration dispute, including counsel fees, shall be paid by the involved MM & P Plans...." Thus, the Court holds that, in the absence of mutual agreement between an employer and the Pension Plan Trustees as to a change in contribution rates, a dispute over the same is, by virtue of section XXIX, subject to arbitration.

While acknowledging that a shortfall assessment may, under section XXIX, be arbitrable during the effective term of the 1981 agreement, Keystone argues that this particular dispute is not so governed, because the demand for both the shortfall assessment, and for arbitration of that issue, arose after the termination of, and Keystone's withdrawal from, the 1981 agreement. Since the touchstone of arbitrability is the parties' intent, the Court must examine the 1981 agreement to discern whether the parties intended that disputes covered by section XXIX be subject to arbitration following termination of the agreement.

The Pension Plan urges the Court to construe the 1981 agreement in light of the presumption of arbitrability of post-termination disputes enunciated by the Supreme Court in *Nolde Brothers, Inc. v. Local No. 358, Bakery & Confectionery Workers Union,* 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977). Relying heavily upon another Supreme Court decision, *Schneider Moving & Storage Co. v. Robbins,* 466 U.S. 364, 104 S.Ct. 1844, 80 L.Ed.2d 366 (1984), Keystone argues that the post-termination presumption identified in *Nolde* pertains only to disputes between unions and employers and is, therefore, inapplicable in a case such as this involving a dispute between an employer and the trustees of an employee-benefit fund.

In *Nolde,* a union sought to compel an employer to arbitrate a dispute concerning its former employees' rights to severance pay under the terms of a terminated collective bargaining agreement. Though the bargaining agreement clearly provided for arbitration of grievances between the parties, it was silent as to the method for

resolving post-termination disputes. The employer in *Nolde* argued that, absent an express provision to the contrary, the duty to arbitrate expired with the termination of the agreement.

The Supreme Court rejected the employer's argument, finding "strong reasons to conclude that the parties did not intend their arbitration duties to terminate automatically with the contract." 97 S.Ct. at 1073.

First among the reasons cited by the Court was the parties' clear preference, manifested in the bargaining agreement, for arbitral rather than judicial interpretation of the parties' obligations. The Court noted, "[t]he contracting parties' confidence in the arbitration process and an arbitrator's presumed special competence in matters concerning bargaining agreements does not terminate with the contract. Nor would their interest in obtaining a prompt and inexpensive resolution of their disputes by an expert tribunal." *Id.*

Second, the Court found that the parties had drafted their broad arbitration agreement "against a backdrop of well-established labor policy favoring arbitration as the means of resolving disputes over the meaning and effect of collective-bargaining agreements." *Id.* In this regard, the Court noted that its previous decisions had "established a strong presumption favoring arbitrability" such that arbitration was not to be denied "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at 1074 quoting *Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. at 582–583, 80 S.Ct. at 1353. Thus, the Court concluded that,

> The parties must be deemed to have been conscious of this policy when they agreed to resolve their contractual differences through arbitration. Consequently, the parties' failure to exclude from arbitrability contract disputes arising after termination, far from manifesting an intent to have arbitration obligations cease with the agreement, affords a basis for concluding that they intended to arbitrate all grievances arising out of the contractual relationship. In short, where the dispute is over a provision of the expired agreement, the presumptions favoring arbitrability must be negated expressly or by clear implication. *Id.* 97 S.Ct. at 1074.

The Pension Plan contends that the *Nolde* presumption is determinative of the issue in the case at bar. Keystone asserts, however, that the Supreme Court's decision in *Schneider* renders the *Nolde* presumption inapplicable to disputes between employee benefit funds and participating employers.

In *Schneider,* trustees of two multi-employer trust funds brought contribution enforcement actions against participating employers. The trustees brought the suits pursuant to authority granted them by the funds' trust-agreements to initiate legal proceedings to collect delinquent contributions. The funds defended, claiming that the lawsuit raised questions concerning the interpretation of the collective bargaining agreements between the company and the union which were subject to arbitral rather than judicial construction. The bargaining agreements contained clauses requiring arbitration of any "differences ... between the Company and the Union or any employee of the Company as to the meaning or application of the provisions of [the collective bargaining] agreement." 104 S.Ct. at 1848.

The *Schneider* Court was faced with the question of the applicability of that arbitration clause to a dispute which involved a benefit plan rather than a company and a union. Before analyzing the express language of the agreement, the Court considered whether to construe the clause in light of the presumption of arbitrability accorded labor-management disputes under *Warrior and Gulf* and its progeny. In this connection, the Court observed that:

> "Such a presumption furthers the national labor policy of peaceful resolution of labor disputes and thus best accords with the parties' presumed objectives in pursuing collective bargaining. *See Steelworkers v. Warrior & Gulf Naviga-*

tion Co., 363 U.S. 574, 578, 582–583, 80 S.Ct. [1347] at 1350, 1352–1353 [4 L.Ed.2d 1409] (1960). There is, however, less to commend the presumption in construing the applicability of arbitration clauses to disputes between the employer and the trustees of employee-benefit funds. Arbitration promotes labor peace because it requires the parties to forego the economic weapons of strike and lockouts. Because the trustees of employee-benefit funds have no recourse to either of those weapons, requiring them to arbitrate disputes with the employer would promote labor peace only indirectly, if at all."

104 S.Ct. at 1849. Based upon this distinction, the Court eschewed use of the presumption of arbitrability "in determining whether arbitration agreements between a union and an employee apply to disputes between trustees and employers, even if those disputes raise questions of interpretation under the collective-bargaining agreements." *Id.* The Court then went on to hold that, absent a presumption of arbitrability, the collective bargaining agreements in *Schneider* evidenced no intent on the part of the parties to require the trustees, as opposed to the unions and employers, to submit disputes to arbitration.

 In the case at bar, Keystone asserts that the reasoning in *Schneider* dictates rejection of the *Nolde* presumption in a case involving a dispute between an employer and the trustees of a benefit plan. Essentially, Keystone's argument boils down to the proposition that the *Nolde* presumption of the arbitrability of post-termination disputes is merely an extension of, and based upon the same grounds as, the *Warrior and Gulf* presumption of arbitrability discussed in *Schneider*. The Court disagrees. While it is clear that the two presumptions are each based upon the promotion of labor peace, this is not the sole reason underlying the *Nolde* presumption. Equally compelling in *Nolde* was a finding that the parties to the clause had

clearly expressed a preference for the expertise of an arbitrator to resolve disputes arising under the contract, a choice which the Court held, did not expire with the termination of the agreement. The identity of the particular parties is simply not a factor in this regard. Thus, the reasoning in *Schneider* does not wholly undercut *Nolde* and the Court finds that the presumption of arbitrability of post-termination disputes is applicable where a dispute arises between parties who have unambiguously provided for arbitration of such disputes arising between themselves.

Practical considerations also support this result. As the Supreme Court recognized in *Nolde*, any other holding would permit a benefit plan to cut off all arbitration of contribution rate changes merely by withdrawing from the plan, the very event that might spur the need to increase rates or charge additional assessments. *Nolde*, 97 S.Ct. at 1067. ("Any other holding would permit the employer to cut off all arbitration of severance-pay claims by terminating an existing contract simultaneously with closing business operations.").

Alternatively, the Court notes that, even were the *Nolde* presumption not applied to the post-termination dispute here, evidence indicates that the parties intended that the clause would continue to govern disputes concerning contribution changes arising under the contract but after its termination. Though section XXIX itself is silent as to the effect of the agreement's expiration on arbitrability, subsequent correspondence concerning the shortfall issue demonstrates that the parties' understood arbitration to be the proper mechanism to resolve the dispute, despite the agreement's expiration.[5]

In June 1986, Keystone's counsel wrote counsel for the pension fund asserting that the assessment, which was made in 1985, was invalid because the Pension Plan had "failed *first* to obtain an arbitrator's approval" (emphasis in original) (defendant's

---

5. Compare *Graphic Communications Union v. Chicago Tribune*, 794 F.2d 1222, 1228 (7th Cir. 1986) (In case in which *Nolde* presumption not applicable, absence of any evidence indicating parties' intent that post-termination dispute be subject to arbitration dictated denial of motion to compel arbitration).

Exhibit 4). Again, in a letter written that same month, Keystone's counsel explained "the 1981–84 Master Agreement required the Pension Plan to consult with Keystone *first* over any proposed change in contribution rates and—failing to reach agreement—to initiate arbitration over the Plan's right to implement the proposed change *before* converting it into a legal liability" (emphasis in original) (defendant's exhibit 5). While the Court expresses no opinion as to the merits of this contention, these letters indicate that Keystone contemplated the continued availability of arbitration as a means to resolve the contribution dispute, despite the fact that the Trustees' action was taken following the agreement's termination. Thus, the Court finds that these letters indicate that the parties intended that post-termination disputes be resolved through the method described in Section XXIX(B)(5) of the 1981 agreement.

Finally, the Court turns to Keystone's contention that any duty possessed by the company to arbitrate the shortfall issue was excused by the pension plan's failure to seek arbitration in a timely fashion. While the Court notes that some courts, relying on dicta in *Nolde*, have considered the timeliness of a request for arbitration, see e.g., *Hotel & Restaurant Employees v. Williams*, 752 F.2d 1476, 1479 (9th Cir.1985) (Union filing of request for arbitration three years after expiration of contract not unreasonable where parties continued negotiating until deadlock occurred and arbitration requested three months after that impasse reached); *Federated Metals Corp. v. United Steelworkers*, 648 F.2d 856, 862 (3d Cir.1981) (Proper inquiry is whether party delayed unreasonably in asserting disputed claims), this Court believes that such matters are procedural issues that should be left for the arbitrator's consideration. *See Local Union No. 370 v. Morrison–Knudsen Co.*, 786 F.2d 1356, 1358 (9th Cir.1986). As the Supreme Court noted in *John Wiley and Sons v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 918, 11 L.Ed.2d 898 (1964), "[o]nce it is determined ... that the parties are obligated to submit the subject matter of the dispute to arbitration, 'procedural' ques-

tions which grow out of the dispute and bear on its final disposition should be left to the arbitrator."

This principal is particularly appropriate in this case, since it appears that Keystone's complaint, relating to the time at which the Pension Plan sought to initiate arbitration, is intimately intertwined with its arguments relating to the invalidity of the shortfall assessment itself. Hence, the Court finds that the timeliness of the Pension Plan's request for arbitration of the shortfall dispute is a procedural matter to be handled by the arbitrator.

For the reasons stated above, the Pension Plan's motion to compel arbitration will be granted.