CHICAGO PNEUMATIC TOOL COMPA-NY; Doris Moore, Edwin Harcourt, and Bruce Daniels, Members of the Retirement Plan Committee of Chicago Pneumatic Tool Company; and Doris Moore, James E. Hoover and Carolyn A. Graham, Members of the Board of the Funded I.A.M. Pension Plan of Chicago Pneumatic Tool Company, Franklin, Pennsylvania, Plaintiffs,

v.

Melvin SMITH, International Association of Machinists and Aerospace Workers, and International Association of Machinists and Aerospace Workers, Local Lodge No. 2275, Defendants.

No. 91–CV–822.

United States District Court, N.D. New York.

June 26, 1995.

Bond Schoeneck & King (Thomas G. Eron, of counsel), Syracuse, NY, Matkov Salzman Madoff & Gunn (Allan Gunn, Kirk D. Messmer, of counsel), Chicago, IL, for plaintiffs.

Pinsky & Skandalis (Alan R. Peterman, of counsel), Syracuse, NY, for defendants.

## MEMORANDUM—DECISION AND ORDER

McCURN, Senior District Judge.

### *BACKGROUND*

Given the at times complex legal issues raised by these motions, it is easy to forget exactly what is at stake in this litigation, and that is whether defendant Melvin Smith is eligible for a pension; and if so, is he entitled to continue receiving monthly pension benefits in the amount of approximately $188.03,[1] or, as Smith maintains, is he entitled to receive pension benefits in an amount greater than that?

At fifty-two years of age and after having been employed by the plaintiff Company, Chicago Pneumatic Tool Company ("Company"), for twenty-three years, defendant Smith, along with others, was terminated as part of a partial shut-down of the Company's operations. During his employment with the Company, Mr. Smith was subject to a collective bargaining agreement ("CBA") between International Association of Machinists and Aerospace Workers Local Lodge No. 335 ("Local 335") and the Company. The CBA provided that bargaining unit employees, such as Smith, were entitled to receive pension benefits pursuant to the terms of a pension agreement between the Company and Local 335,[2] which was attached to the CBA. Both the CBA and the Pension Plan were to remain in effect until August 31, 1984. Affidavit of John E. Roberts (June 29, 1992), exh. A thereto at 35.

The CBA contained a four step grievance and arbitration procedure, which was incorporated by reference into the Pension Plan.

---

[1]. Transcript of Oral Argument (Oct. 15, 1992) ("Tr.") at 23. As will be more fully explained herein, after the issuance of the arbitration award which is the subject of this litigation, the Company's Pension Plan Committee calculated that this was the amount due defendant Smith.

[2]. The court will refer to that agreement as simply "the Pension Plan."

*Id.*, exh. A thereto at 27–30. Under the terms of the CBA, that procedure was available to resolve "differences" between the Company and the Union "as to the meaning and application" of the CBA provisions. *Id.*, exh. A thereto at 28. The Pension Plan in turn sets forth an "appeals procedure," which provides in salient part:

a. If **any difference** shall arise between the Company or the Board and any person who shall be an **applicant** for a pension as to:

 1. the number of years of Service and of Credited service of such applicant in the employ of the Company; or

 2. **an applicant's right to a pension;** or

 3. the age of the applicant; or

 4. whether an applicant, who shall have been determined to be permanently incapacitated *and who* shall have at least ten years of such Credited Service but shall not have obtained the age of 65 years, shall have become so permanently incapacitated through some unavoidable cause;

such difference may be taken up as a grievance in accordance with the provision of Article XXIII of the [CBA], beginning at Step 4 thereof.[3]

*Id.*, exh. B thereto at 31 (emphasis and footnote added).

According to the Company, approximately one year after the partial shutdown, effective December 31, 1984, inactive participants in the Pension Plan, as well as other Company pension plans were " 'spun off' or transferred into The Terminated Operations Plan for Certain Employees of Chicago Pneumatic Tool Company ("Terminated Operations Plan")." Affidavit of Doris J. Moore (Aug. 13, 1992) at ¶ 2, and exh. A thereto. On August 16, 1990, the Terminated Operations Plan was amended and reinstated, retroactive to January 1, 1989. *Id.* at ¶ 9. This amendment and reinstatement "reflect[ed]

the addition of active employees at the Company's Franklin, Pennsylvania operation to The Terminated Operations Plan." [4] *Id.* Importantly, in contrast to the CBA and the Pension Plan, the Company deliberately chose not to include a grievance and arbitration procedure in the Terminated Operations Plan. *See* Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment ("Plaintiffs' Memorandum") at 22–25.

Slightly more than six years after Smith was terminated from the Company, in January, 1990, he applied for a pension under the Pension Plan. Roberts Aff. at ¶ 10. Before applying for that pension, Mr. Smith had been diagnosed as having several medical conditions, including Parkinson's disease, Bell's Palsy, and degenerative arthritis. *Id.* Those conditions and ailments rendered him permanently disabled and unable to work, and no one disputes that. *Id.*, exh. J thereto at 8. By letter dated March 21, 1990, the Company denied Mr. Smith's request for a disability pension, explaining that he was not so entitled because he had become disabled after his termination from the Company. *Id.*, exh. C thereto. That letter closed by advising Smith that he would "[b]e entitled to a reduced pension benefit when [he] reach[es] age 60 if you so elect." *Id.*

Another one of the defendants, International Association of Machinists and Aerospace Workers, Local Lodge No. 2275 ("Local 2275"),[5] filed a grievance, on behalf of Mr. Smith, challenging the denial of his disability pension. *Id.*, exh. D thereto. Consistent with its initial determination that Mr. Smith was not eligible for a disability pension because he did not become disabled while actively employed with the Company, that grievance was denied. *Id.*, exh. E thereto. Local 2275 immediately appealed indicating its desire "to proceed to the next step of the grievance procedure as soon as possible." *Id.*, exh. F thereto.

---

3. Step four of the grievance procedure gives the Union the opportunity to request arbitration. *See* Roberts Aff., exh. A thereto at 29.

4. The Company places defendant Smith in that category.

5. Local 2275 rather than Local 335 filed that grievance because in 1985 those two Locals had merged. Roberts Aff. at ¶ 9.

Following a meeting between the Company and Local 2275, pursuant to step three of the grievance process, the Company reaffirmed its position that Smith was not eligible for a disability pension because he did not become disabled while actively employed with the Company, and again denied Smith's grievance. *Id.*, exh. G thereto. On May 25, 1990, Local 2275 and the Company then agreed to submit the issue of Mr. Smith's eligibility for a disability pension to an arbitrator. *Id.*, exh. I thereto. On December 13, 1990, a hearing was held before the arbitrator. At the hearing, the Company maintained, as it continues to on these motions, that Mr. Smith was covered by the Terminated Operations Plan, which, unlike the CBA and Pension Plan, did not contain a grievance and arbitration procedure. The Company therefore took the position that Smith's grievance was not arbitrable. The Company took that position despite the fact that it had not raised that issue during the entire course of the pre-arbitration grievance process. Roberts Aff., exh. J thereto at 13.

A full hearing was conducted before the arbitrator in which the parties were given the opportunity to introduce evidence, call witnesses in support of their respective positions, cross-examine the adversary's witnesses, and file post-hearing briefs. On April 23, 1992, the arbitrator issued his opinion and award. After determining that the issue of arbitrability was properly before him, the arbitrator expressly found Smith's pension grievance to be arbitrable. Roberts Aff., exh. J thereto at 13. In reaching that conclusion, the arbitrator disagreed with the Company's assertion that Smith's grievance was not arbitrable because it was governed by the Terminated Operations Plan, which does not provide for arbitration. Instead, the arbitrator found that Smith's grievance had "nothing whatsoever" to do with the Terminated Operations Plan, but rather he was seeking enforcement of a pension benefit under the original Pension Plan, which did allow for arbitration of certain disputes arising thereunder. *Id.*, exh. J thereto at 14–15.

Insofar as the merits of Smith's grievance were concerned, the arbitrator found that he was "entitled to commence his deferred pension benefits at an earlier age than 65 or 60 in accordance with the provisions of Section II 4(c) [of the Pension Plan]." *Id.* at 19. In closing, the arbitrator retained jurisdiction "for the purpose of insuring compliance with this Award." *Id.* at 21.

According to defendant Smith, the Company has disregarded the arbitrator's award by giving him a reduced rather than an unreduced pension. Because the Company believed that Smith was only entitled to an actuarily reduced pension if he elected to commence his pension immediately in accordance with the arbitration award, in July, 1991 it agreed to allow Mr. Smith "to apply for and receive an immediate pension reduced in accordance with the attached Table 1 which is the table of actuarial equivalents attached to The Terminated Operations Plan . . . ." *Id.*, exh. K thereto. Thus, in the intervening years Mr. Smith has been receiving a reduced deferred pension, which the Company agrees it will not upset even if it ultimately prevails in this litigation.[6] *Id.* Conversely, the Company allows that if it is not successful in this action, "Mr. Smith will be reimbursed for the difference of the benefit paid and any higher pension amount." *Id.*

Despite this temporary conciliation, because it disagreed with the arbitrator's award, the Company commenced this action. In addition to the Company, there are five individual plaintiffs: Edwin Harcourt and Bruce Daniels, members of the Company's Retirement Plan Committee, as well as James E. Hoover and Carolyn A. Graham, members of the Company's Board of the Funded I.A.M. Pension Plan (the Local 335 Pension Plan), and Doris Moore in her capacity as a member of both of those entities.[7] In addition to Mr. Smith and Local 2275, also named as a defendant in this action is the

---

6. The Company agreed to pay such pension benefits retroactive to February 1, 1990—the first benefit month after Smith's initial pension application. Affidavit of Carolyn A. Graham (Aug. 14, 1992) at ¶ 10.

7. For brevity, unless otherwise indicated, the plaintiffs will be referred to collectively throughout as "the Company."

International Association of Machinists and Aerospace Workers ("the International"). The two Locals referenced herein, 2275 and 335, are affiliates of that International. Roberts Aff. at ¶ 24.

Jurisdiction in this case is predicated upon two separate statutes: (1) section 301(a) of the Labor–Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), and (2) section 502(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a). The Company sets forth three separate "counts" or causes of action in its first amended complaint. In the first cause of action, the Company seeks "an order declaring that [the Pension Plan] Board's determination of the amount of pension payable to Defendant Melvin Smith is correct and in full compliance with the terms of the Terminated Operations Plan and the Prior Plan [the Pension Plan]." First Amended Complaint ("Complaint") at ¶ 24. In its second and third causes of action the Company seeks to set aside and vacate the arbitration award. More specifically, in the second cause of action the Company alleges that vacatur is mandated because the arbitrator lacked jurisdiction to decide Smith's grievance in that the Terminated Operations Plan had no provision for arbitration. The third cause of action, also seeking vacatur, alleges that the award "is patently at odds with the terms of the Prior [Pension] Plan and the Terminated Operations Plan[.]" *Id.* at ¶ 34. The Company further alleges that the award "is not founded on the terms of either Plan, and [it] exceeds the authority of the Arbitrator." *Id.* Based upon the foregoing allegations, in addition to seeking an order as described in its first cause of action, the Company seeks an order "enjoining Defendants from challenging Plaintiffs' determination of the rights of Defendant Melvin Smith[,]" as well as an order "setting aside and vacating the Award of [the] Arbitrator[.]" *Id.* at 7.

Local 2275 did not sit idly by while the Company commenced this action. At the same time the Company was commencing this action, defendant Local 2275 was also commencing an action to confirm the arbitration award. Affidavit of Alan R. Peterman (July 6, 1992) at ¶ 9. That action was instituted in the United States District Court for the Western District of Pennsylvania. *Id.* By stipulation, on June 10, 1992, Smith filed an amended answer in this action, interposing a counterclaim pursuant to section 301 of the LMRA, seeking confirmation of the arbitration award, as well as denial of the Company's application to vacate that award. Amended Answer to Plaintiff's [sic] First Amended Complaint ("Answer") at ¶ 33 and p. 10, ¶ d. In addition to that counterclaim, defendants enumerate five separate affirmative defenses. Eventually the parties also stipulated to dismissal of Local 2275's Pennsylvania action. Peterman Aff. at ¶ 10.

Defendants are now moving for summary judgment on their counterclaim, seeking confirmation of the arbitration award. They offer three possible grounds for confirmation. First, the arbitration award is enforceable because the arbitrator had the authority to decide that dispute because it arose under the terms of the terminated [8] CBA and Pension Plan and the dispute was arbitrable under those Agreements. The defendants also argue that the award is enforceable because it "took its essence" from the CBA and Pension Plan. *Id.* at ¶ 11(a). Second, the arbitration award should be confirmed because, according to the defendants, by its actions the Company selected the grievance and arbitration process as the method of determining Mr. Smith's entitlement to a pension under the Terminated Operations Plan; and the defendants continue to press their argument that the award "took its essence" from the CBA and Pension Plan and is thus enforceable. *Id.* at ¶ 11(b). Finally, the defendants assert that under Pennsylvania law, which they contend provides the

**8.** The parties variously refer to these Agreements as having expired and/or terminated, without explaining the significance, if any, of the choice of one term or the other. The court will consistently refer to those Agreement as having been terminated, however, because it strikes the court that that is the more precise term under the circumstances, in that due to the partial shutdown of the Franklin plant, those Agreements were terminated prior to their August 31, 1984 expiration date.

governing statute of limitations, the Company's action to vacate the arbitration award is not timely, and thus the defendants' motion seeking confirmation of that award should be granted. *Id.* at ¶ 11(c). Alternatively, if the court declines to confirm the arbitration award, defendants Smith and the International Union seek dismissal of the complaint on the basis that the complaint fails to state a cause of action as against them. Insofar as the Company's ERISA cause of action is concerned, the defendants are seeking dismissal of the same on the grounds that the plaintiffs lack standing.[9]

Last, if the court grants the defendants' motion for confirmation, they are seeking attorney's fees pursuant to section 502(g) of ERISA, 29 U.S.C. § 1132(g), on the theory that they would be a prevailing party in an action to enforce a participant's pension rights. As an alternative basis for seeking attorney's fees, the defendants ask the court to rely upon its "inherent power" to make such an award, claiming that the Company brought this action in bad faith. Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defendants' Memorandum") at 28.

A little over a month after defendants filed their motion, the Company also filed a motion seeking summary judgment in its favor on the three causes of action alleged in their complaint. In addition, the Company is seeking summary judgment on defendants' counterclaim, which seeks confirmation of the arbitration award. In making this motion, the Company argues, not surprisingly, that its action is not time barred. Next the Company asserts that Smith's pension grievance is not arbitrable because it arose after the termination of the CBA and Pension Plan. Alternatively, the Company asserts that the arbitration award must be vacated because

"it is not founded in the terms of Melvin Smith's Pension Plan." Plaintiffs' Memorandum at 25. Even if the court finds that the arbitration award should be allowed to stand, the Company maintains that the fiduciaries correctly determined the amount of Smith's pension, and thus they are entitled to summary judgment, finding as a matter of law that the Pension Plan Committee's determination as to the monthly amount of Smith's pension benefit is not arbitrary or capricious. The Company's penultimate argument is that the International is an indispensable party to this action, and thus its motion to dismiss should not be granted. Finally, the Company counters that the defendants are not entitled to recover their attorney's fees.

The court will consider each of these many arguments in turn.

## DISCUSSION

### I. Summary Judgment

■ Given that the parties are no doubt intimately familiar with the summary judgment standards as clarified by the Supreme Court in a trilogy of cases in 1986,[10] the court sees no need to repeat the same herein. The court emphasizes, however, that the operative facts here are uncontroverted. Thus, rather than engaging in a fact-finding inquiry, these motions call upon the court to decide the legal significance to be accorded the undisputed facts. *See Mays v. Mahoney*, 91 Civ. 3435, 1994 WL 48831, at *3, 1993 U.S. Dist. LEXIS 19234, at *7–*8 (S.D.N.Y. Feb. 14, 1994) ("[c]ontroversy over the legal significance of undisputed facts will not impede summary judgment[ ]"). By way of example, among other things, this court is faced with the task of interpreting the CBA and the Pension Plan to determine whether defendant Smith's grievance was arbitrable. *See International Union, UAW, v. Young Radia-*

---

9. In bringing these motions, defendants rely solely upon the summary judgment rule—Fed. R.Civ.P. 56(b); they do so despite the fact that as to this aspect of their motion they specifically seek dismissal, rather than summary judgment. Presumably defendants couched their standing motion in terms of dismissal because, as will become evident, to decide that issue there is no need for the court to go beyond the pleadings. In that case, this aspect of defendants' motion would more properly be brought under Rule 12.

*See Thompson v. County of Franklin*, 15 F.3d 245, 247 (2d Cir.1994).

10. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

*tor Co.*, 904 F.2d 9, 10–11 (7th Cir.1990) (whether CBA required employer to arbitrate dispute with union properly decided on summary judgment motion where only interpretation of CBA involved). Consequently, this action is ripe for summary judgment. *See Cadbury Beverages, Inc. v. Cott Corp.*, 850 F.Supp. 256, 257 (S.D.N.Y.1994) (summary judgment appropriate where parties disagree only as to legal conclusions to be drawn from the undisputed facts).

## II. Statute of Limitations

The first potentially significant obstacle to the Company's seeking to vacate the arbitration award is the defendants' statute of limitations argument. Section 301 of the LMRA is the starting point for the court's analysis of this statute of limitations defense.[11] Section 301 confers subject matter jurisdiction on this court over actions to vacate an arbitration award. *See Burns Intern. Sec. Services v. Intern. Union UPGWA*, 47 F.3d 14, 16 (2d Cir.1995) (citation omitted). As with many federal statutes,[12] however, the LMRA is silent as to the appropriate statute of limitations for such an action. *Id.* (citations omitted). Therefore, "[t]he relevant state statute is borrowed." *Id.* (citations omitted). The parties vehemently disagree as to what the relevant state statute of limitations is in this case.

Defendants assert that this court should look to Pennsylvania's statute of limitations governing vacatur of arbitration awards because, in essence, that State has the most contacts with this litigation. In particular,

defendants contend that because the arbitration award was rendered in Pennsylvania, by a Pennsylvania arbitrator, and because defendants Smith and the Local are both Pennsylvania residents, Pennsylvania and not New York has the greatest interest in having it law applied. Besides these Pennsylvania contacts, defendants point out that the CBA and Pension Plan were both executed in Pennsylvania by Pennsylvania residents.[13] From defendant's perspective, the only New York contacts are that New York is the forum state for this litigation and that the administration of one of the pension plans was transferred to New York after the plan was terminated. Based upon all of these factors, defendants strongly urge the application of Pennsylvania law, which, in most circumstances, requires that an action to vacate an arbitration award be brought "within 30 days after delivery of a copy of the award to the applicant[.]"[14] 42 Pa.C.S. § 7314(b) (1994). It is undisputed that the Company did not file this action within that thirty day time frame. Therefore, defendants assert that they are entitled to summary judgment as a matter of law, dismissing as untimely the Company's second and third causes of action, which seek to vacate the contested arbitration award.

On the other hand, with equal conviction the Company argues that New York law controls the statute of limitations issue because it is the forum state. Countering defendants' suggestion that New York has no interest in having its statute of limitations applied in this case, the Company lists a number of contacts to this State, which, tak-

---

**11.** Defendants' statute of limitations defense pertains only to the plaintiffs' second and third causes of action, which seek to vacate the arbitration award. Answer at 7, ¶ 32. Therefore, even though there is also an ERISA claim in this action, defendants do not argue that that claim too is time barred.

**12.** More than once the Supreme Court has observed that the lack of a specific statute of limitations in a federal statute is " 'a void which is common place....' " *Wilson v. Garcia*, 471 U.S. 261, 266, 105 S.Ct. 1938, 1942, 85 L.Ed.2d 254 (1985) (quoting *Board of Regents v. Tomanio*, 446 U.S. 478, 483, 100 S.Ct. 1790, 1794, 64 L.Ed.2d 440 (1980)); *see also United Steelworkers, AFL–CIO–CLC v. Crown Cork*, 32 F.3d 53, 55 (3rd Cir.1994).

**13.** It is not readily apparent from the face of those documents, however, where they were executed; nor is there any reference thereon as to the parties' residence.

**14.** Section 7314(b) reads in its entirety as follows:

TIME LIMITATION.—An application under this section ["Vacating award by court"] shall be within 30 days after delivery of a copy of the award to the applicant, except that, if predicated upon corruption, fraud, misconduct or other improper means, it shall be made within 30 days after such grounds are known or should have been known to the applicant.
42 Pa.C.S. § 7314(b) (1994) (emphasis added).

en together, in its opinion, warrant the opposite conclusion. Specifically, the Company enumerates the following New York contacts: (1) It has its principal place of business in Utica, New York; (2) "[a]ll members of the Retirement and Savings Plan Committee [including plaintiffs Moore, Harcourt and Daniels] have their offices at the Company's principal office in Utica[;]"[15] (3) "[t]he assets of the trust from which pension benefits are paid under the Terminated Operations Plan are held by Chase Manhattan Bank, the principal office of which is located in New York City[;]"[16] and (4) "[t]he Investment Manager of the trust assets is ... located in New York City."[17] For all of these reasons, the Company steadfastly maintains that New York law applies. Accordingly, pursuant to section 7511(a) of the New York Civil Practice Law and Rules ("CPLR"),[18] the Company claims that it filed the complaint in this action within ninety days of receiving the arbitration award. In fact, the Company commenced this action eighty-five days after receiving the arbitration award. *See* Affidavit of Allan Gunn (Aug. 17, 1992) at ¶ 2. What is more, at oral argument defendants conceded that if the court decides that New York law provides the controlling statute of limitations, then there is no dispute that this action to vacate was timely commenced. Tr. at 20.

As mentioned at the start of this section, the LMRA provides the court with absolutely no guidance as to which statute of limitations to apply in this action. Despite that silence, in accordance with well-settled case law in this Circuit, the court will look to the law of the forum state—New York. *See Hollander v. Brezenoff,* 787 F.2d 834, 837 (2d Cir.1986) (citing *Cope v. Anderson,* 331 U.S. 461, 463, 67 S.Ct. 1340, 1341, 91 L.Ed. 1602 (1947)); *Colonial Acquisition Part. v. Colonial at Lynnfield,* 697 F.Supp. 714, 716 (S.D.N.Y.1988) (and cases cited therein); *Zola v. Gordon,* 685 F.Supp. 354, 363 (S.D.N.Y.1988) (citing, *inter alia, UAW v. Hoosier Cardinal Corp.,* 383 U.S. 696, 703–704, 86 S.Ct. 1107, 1112–1113, 16 L.Ed.2d 192 (1966)).[19] As just stated, New York requires that an action to vacate an arbitration award be commenced within ninety days after delivery of the arbitration award to the party seeking vacatur; and that was done here. *See* CPLR § 7511(a). Thus, because the Company timely commenced its action to vacate, defendants' motion for summary judgment on the grounds that the statute of limitations bars the Company's second and third causes of action, based as they are upon vacatur of an arbitration award, must be denied.[20]

**15.** Moore Affidavit at ¶ 11.

**16.** *Id.* at ¶ 14.

**17.** *Id.* at ¶ 15.

**18.** That statute provides that an action to vacate or modify an arbitration award "may be made by a party within ninety days after its delivery to him." N.Y.Civ.Prac.L. & R. § 7511(a) (McKinney 1980).

**19.** *Accord San Diego County Dist. Council v. Cory,* 685 F.2d 1137, 1139 (9th Cir.1982) (citation omitted) ("When Congress does not provide a statute of limitations for a federal cause of action, we apply the forum state's statute of limitations unless it unduly qualifies or diminishes the federal right the cause of action seeks to protect."); *cf. Ceres Partners v. GEL Associates,* 918 F.2d 349, 352–353 (2d Cir.1990) (citations omitted) ("With respect to implied causes of action under the federal securities laws, this Circuit, ..., has consistently held that the statute of limitations should be adopted by reference to the pertinent laws of the forum state[.]").

**20.** Before leaving the statute of limitations issue, the court has two observations. The first pertains to New York's borrowing statute, N.Y.Civ. Prac.L. & R. § 202 (McKinney 1990). Despite that it ultimately concludes that that statute should not figure into this court's analysis, the Company devotes much of its statute of limitations argument to a discussion of that statute. Therefore, as will be seen, even though the court is skeptical as to its relevance here, the court will, nevertheless, address the same.

Of course the court recognizes that reference to the forum state's statute of limitations where the federal statute fails to provide a specific statute of limitations requires the court to look at that state's borrowing statute as well, if the same is triggered. *See Arneil v. Ramsey,* 550 F.2d 774, 779 (2d Cir.1977) (citing *Cope v. Anderson, supra* ); *Gorlin v. Bond Richman & Co.,* 706 F.Supp. 236, 239 (S.D.N.Y.1989) (citation omitted); and *Zola, supra,* 685 F.Supp. at 363 (citations omitted). Under the particular facts of this case, however, the court has some serious reservations as to whether New York's borrowing statute should even factor into the court's statute of limitations analysis. That statute "requires

that a nonresident plaintiff's claim that accrued outside of the state must be timely under the statute of limitations of both New York and the state where the claim accrued." *Cuccolo v. Lipsky, Goodkin & Co.*, 826 F.Supp. 763, 767 (S.D.N.Y.1993) (footnote omitted). It does not appear, though, that the Company, which has its principal office in New York, would qualify as a non-resident for purposes of invoking this statute. *See McMahan & Co. v. Donaldson, Lufkin & Jenrette*, 727 F.Supp. 833, 834 (S.D.N.Y.1989) (internal quotations and citation omitted) ("[T]he existence of a principal office in New York should result in a finding of resident under CPLR § 202."). Nor does it appear that the causes of action to vacate the arbitration award accrued "outside of the state"—another element necessary to implicate the borrowing statute. *Cuccolo*, 826 F.Supp. at 767. A cause of action accrues under section 202 " '[w]here the injury is sustained.' " *Id.* at 767 n. 2 (quoting *Gorlin, supra*, 706 F.Supp. at 240) (other citation omitted). "An economic injury generally occurs in the state where plaintiff resides." *Id.* (citation omitted). Thus, in the present case, because the Company resides in New York, and because it has allegedly sustained economic injury in this State due to the fact that some time after the issuance of the arbitration award, it has been paying defendant Smith a pension from a fund located and administered in New York, the Company's causes of action to vacate that award accrued within this State for purposes of section 202. *See id.* Consequently, it is highly questionable in this situation whether the borrowing statute is even relevant.

Besides the fact that from a factual standpoint New York's borrowing statute, in all likelihood, is not implicated here, there is an additional reason behind the court's reluctance to rely upon that statute in this context. And that reason was convincingly articulated by the Sixth Circuit in *Champion Intern. v. United Paperworkers Intern.*, 779 F.2d 328 (6th Cir.1985). The *Champion* Court soundly reasoned that "[f]ederal law, rather than a state borrowing statute, should ... govern the choice between the forum state's statute of limitation and that of another state in a Section 301 case." *Id.* at 333. Quoting from the Supreme Court's decision in *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the Sixth Circuit explained, " '[t]he considerations that urge adjudication by the same law in all courts within a State when enforcing a right created by that State are hardly relevant for determining the rules which bar enforcement of [a] ... right created not by a State legislature but by Congress.' " *Id.* (462 U.S. at 160 n. 13, 103 S.Ct. at 2289 n. 13 (quoting in turn *Holmberg v. Armbrecht*, 327 U.S. 392, 394–395, 66 S.Ct. 582, 583–584, 90 L.Ed. 743 (1946)). So, continued the Sixth Circuit, "[f]or this reason the application of a state borrowing statute in a Section 301 case will comport with federal labor policy only coincidentally, if at all." *Id.* The Sixth Circuit made one final and insightful point as to why state borrowing statutes have no place in a federal

court's analysis of the statute of limitations in section 301 cases, and that is that "a borrowing statute's complex calculus of contacts and interest may produce considerable difficulty in application and uncertainty of outcome without any corresponding improvement of result." *Id.* at 333–334 (internal quotations and citation omitted).

In light of the foregoing, the *Champion* Court "conclude[d] that the forum state's statute of limitations governing the most closely analogous state substantive claim controls, unless a party can demonstrate that the adoption of the forum state's limitation period will substantially undermine federal labor policy or cause the parties undue hardship." *Id.* at 334 (emphasis added) (citation omitted). Reasoning that "[t]he state cause of action is perfectly analogous to the federal claim[,]" and finding that there was "[n]o evidence suggest[ing] that application of the forum state's limitations period will create a danger to federal labor policy or unfairness to the parties[,]" the *Champion* Court found that "the district court correctly applied the forum state's statue of limitations for actions to vacate arbitration awards." *Id. See also Eichleay Corp. v. Intern. Ass'n of Iron Workers*, 944 F.2d 1047 (3rd Cir.1991), *cert. dismissed*, 503 U.S. 915, 112 S.Ct. 1285, 117 L.Ed.2d 510 (1992) (footnote omitted) (district court properly applied statute of limitations of forum state—Pennsylvania—rather than that of California, because enforcement of the arbitration award therein would not so frustrate labor policies so as to justify a departure from the general rule that the law of the forum state should control).

Likewise, assuming that this court eventually confirms the arbitration award, the defendants have not shown that federal labor policies would be frustrated by so doing. Nor have they shown any undue hardship which would result from application of the forum state's statute of limitations. Accordingly, the court sees not reason to depart from the general rule that the law of the forum state provides the statute of limitations for the Company's section 301 claims herein.

The court's second observation relates to choice of law. In applying the law of the forum state, obviously the court has not engaged in a choice of law analysis. Most likely, federal, as opposed to state, choice of law analysis is proper because jurisdiction is based upon the existence of a federal question and not diversity. *See Barkanic v. General Admin. of CAAC*, 923 F.2d 957, 961 (2d Cir.1991) (citation omitted). In any event, "[t]he federal and New York [choice of law] doctrines invoke similar considerations." *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 350 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992) (internal quotations and citations omitted). Both require "apply[ing] the law of the jurisdiction having the greatest interest in the litigation[.]" *See id.* at 350 (citations omitted). Although the court has deliberately chosen to forego such an analysis, on the present record the court's preliminary

### III. Arbitrability

Because the court has determined that the Company's action to vacate was timely, it must now turn to the more troublesome issue of arbitrability. As previously mentioned, among other things, the Company is seeking to set aside and vacate the arbitrator's award. Conversely, in their first counter-claim, defendants are seeking confirmation of that same award. Bound up with the Company's argument that the arbitration award should be vacated is the fundamental issue of whether defendant Smith's grievance was arbitrable in the first place; that is, whether the CBA obligated the parties to arbitrate Smith's particular grievance. *See New York Typographical Union No. 6 & Printers League Section of the Association of Graphic Arts,* 89 Civ. 4839, 1992 WL 84476, at *5, 1992 U.S.Dist. LEXIS 4865, at *14-*15, 122 Lab. Cas. (CCH) ¶ 10, 285 (S.D.N.Y. April 14, 1992).

In *Spector v. Torenberg,* 852 F.Supp. 201 (S.D.N.Y.1994), the court accurately stated, "[a] party moving to vacate an arbitration award has the burden of proof[.]" *Id.* at 206 (citation omitted). "[T]he showing required to avoid confirmation is very high[.]" *Id.* (citing *Ottley v. Schwartzberg,* 819 F.2d 373, 376 (2d Cir.1987)). "This limited judicial re-view reflects the desire to 'avoid undermining the twin goals of arbitration, namely settling disputes efficiently and avoiding long and expensive litigation.'" *Id.* (quoting *Folkways Music Publishers, Inc. v. Weiss,* 989 F.2d 108, 111 (2d Cir.1993)). "As the Court of Appeals for the Second Circuit has ob-served, '[a]rbitration cannot achieve the sav-ings in time and money for which it is justly renowned if it becomes merely the first step in lengthy litigation.'" *Id.* (quoting *National Bulk Carriers, Inc. & Princess Management*

Co., 597 F.2d 819, 825 (2d Cir.1979)). As the foregoing makes abundantly clear, the Com-pany, as the party seeking to vacate the arbitration award in this case, has a high hurdle to clear.

There are several oft-repeated pre-cepts which traditionally have guided courts in determining whether a given labor dispute is arbitrable. The first is that "[p]arty con-sent is the cornerstone of arbitration." *National Cleaning Contractors v. Local 32B–32J,* 833 F.Supp. 420, 424 (S.D.N.Y.1993). Accordingly, "'[a]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he [or she] has not agreed to submit.'" *Id.* (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)) (oth-er citation omitted). The second is that it is the court and not the arbitrator which must decide whether a party can be compelled to arbitrate, as well as the issue of whether a given dispute is arbitrable. *See Bevona v. 820 Second Ave. Associates,* 27 F.3d 37, 39 (2d Cir.1994) (citing *AT & T Technologies, Inc. v. Communications Workers of Amer-ica,* 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986)).[21] In that way a party cannot be forced to "'arbitrate the issue of arbitrability'." *Litton Financial Printing v. NLRB,* 501 U.S. 190, 208, 111 S.Ct. 2215, 2226, 115 L.Ed.2d 177 (1991) (quoting *AT & T Technologies,* 475 U.S. at 651, 106 S.Ct. at 1419–1420). Thus, the issue of arbitrability is undeniably one for judicial determination.

The third precept directs that in con-sidering the arbitrability of a given dispute, the court should not decide the merits of the

---

assessment, but the court is not so holding, is that the result would be the same—New York's statute of limitations would govern this action insofar as it is premised upon section 301 of the LMRA.

21. In this regard, the courts notes that the Com-pany is correct that even though the arbitrator in this case found Smith's grievance to be arbitra-ble, Roberts Aff., exh. J thereto at 15, that deter-mination is of no consequence here. *See John Wiley & Sons v. Livingston,* 376 U.S. 543, 547, 84

S.Ct. 909, 913, 11 L.Ed.2d 898 (1964) ("[t]he duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty"); *Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 241, 82 S.Ct. 1318, 1320, 8 L.Ed.2d 462 (1962) ("[u]nder our decisions, whether or not the company was bound to arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the par-ties").

grievance.[22] "Finally, where the collective bargaining agreement contains an arbitration clause, there is a 'presumption of arbitrability.'" *Truck Drivers Local 807 v. Regional Import & Export,* 944 F.2d 1037, 1043 (2d Cir.1991) (quoting *AT & T Technologies,* 475 U.S. at 650, 106 S.Ct. at 1419). "In other words, "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

Doubts should be resolved in favor of coverage.'" *Id.* (quoting *AT & T,* 475 U.S. at 650, 106 S.Ct. at 1419) (quoting in turn *United Steelworkers,* 363 U.S. at 582–83, 80 S.Ct. at 1353). As the Second Circuit has explained, "[t]his 'presumption of arbitrability' flows from the national labor policy favoring arbitration in labor disputes because it promotes labor peace and avoids the more volatile remedies of strikes and lock-outs." *Id.* (citations omitted).[23] Mindful of these gener-

**22.** It is incredible to the court that this issue was not discussed by either party to this action given the amount of discussion it has engendered in case law since *Litton.* Regardless, the principle that a court should not look at the merits of a grievance when deciding the arbitrability issue originated in *Nolde Brothers, Inc. v. Local 358, Bakery and Confectionery Workers Union, AFL–CIO,* 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977), wherein the Supreme Court held that in deciding whether parties have a duty to arbitrate a given issue under a lapsed CBA, courts are not to reach the merits. *Id.* at 250, 97 S.Ct. at 1071 ("Of course, in determining the arbitrability of the dispute, the merits of the underlying claim for severance pay are not before us."). Instead, courts should order arbitration if the lapsed CBA arguably creates the obligation which is the subject of the grievance. *See Luden's Inc. v. Local Union No. 6,* 28 F.3d 347, 353 n. 8 (3rd Cir.1994) (same) (and cases cited therein) (emphasis added by Third Circuit).

The continuing validity of this rule was called into question by the Supreme Court's decision in *Litton* however. The *Litton* Court unequivocally stated, "[W]e must determine whether the parties agreed to arbitrate this dispute, and we cannot avoid that duty because it requires us to interpret a provision of a bargaining agreement." 501 U.S. at 209, 111 S.Ct. at 2227. Moreover, as the Third Circuit astutely observed, the *Litton* Court "took this prescription quite seriously, for, as Justice Marshall pointed out in his dissent, it was debatable whether the obligation at issue in *Litton* arose under the expired CBA or not." *Luden's,* 28 F.3d at 354 n. 9 (citations omitted). As the foregoing demonstrates, and as the Third Circuit recognized, *Nolde* and *Litton* "are in tension" with respect to whether the court has a duty to reach the merits of a grievance in deciding the arbitrability issue. *Id.* at 353.

Despite that seeming conflict, the Third Circuit in *Luden's* opined that as far as it was able to discern, "other courts have uniformly resolved this tension by reading *Litton* as having impliedly overruled the portion of *Nolde* holding that a court answering the arbitrability question is not to look to the merits of the underlying claim." *Id.* at 354 (and cases cited therein at n. 10). To illustrate, in *Independent Lift Truck Builders Un. v. Hyster Co.,* 2 F.3d 233 (7th Cir.1993), after

discussing *Litton,* whose reasoning it described as "less than clear," the Seventh Circuit observed: "It appears, then, that the rule that courts must decide arbitrators' jurisdiction takes precedence over the rule that courts are not to decide the merits of the underlying dispute. If the court must, to decide the arbitrability issue, rule on the merits, so be it." *Id.* at 236. A significant factor in the Court's decision to address the merits in *Independent Lift Truck* was that the three issues therein, the Union's standing, arbitrability, and whether the grievance had merit, "all collapse[d] into the same inquiry: whether the collective bargaining agreement cover[ed] retired employees." *Id.* at 235. The Court further explained, "[a] court or arbitrator addressing one of the inquiries must necessarily answer the other two: if retired employees are covered by the agreement, then the Union has standing, the grievance is arbitrable, and the grievance has merit. If, on the other hand, the agreement does not extend to retired employees, then the Union has no standing." *Id.* In light of the foregoing, the Seventh Circuit concluded that the district court "erred in ordering the dispute to arbitration without first determining that it was arbitrable." *Id.* at 236. The Court therefore remanded the case for a determination by the district court as to whether the CBA applied to retired employees. *Id.* at 237. "Only after the district court has determined that the parties intended the agreement to apply to retired employees may the court order the dispute to arbitration." *Id.* Obviously then at least insofar as the Seventh Circuit is concerned, the merits of the underlying grievance are inextricably intertwined with resolution of the arbitrability issue.

Similarly, in the present case, in deciding whether Smith's pension grievance was arbitrable, the court cannot completely disregard the merits of that grievance. This court therefore does not have the luxury, as did the Third Circuit in *Luden's,* of declining to "address the uncertain interplay between *Nolde* and *Litton*" as to whether, in addressing the arbitrability issue, a court may also examine the merits of the underlying grievance. *See Luden's,* 28 F.3d at 354.

**23.** *See also New York Typographical Union No. 6, supra,* at *5, 1992 U.S.Dist. LEXIS 4865, at *15

al principles, the court will now turn to the issue of whether Smith's pension grievance was arbitrable.

## IV. Litton/Nolde Framework

To place the parties' arbitrability arguments in context, it is first necessary to carefully examine two Supreme Court cases which separately form the basis for the parties' respective positions on this issue. Those cases are *Nolde* and the more recent *Litton* decision.

Defendants contend that even though the CBA, and the Pension Plan along with it, terminated in 1984, because the CBA contained a fairly detailed grievance and arbitration procedure, which was incorporated in the Pension Plan, the Company's obligation to arbitrate survived the termination of those Agreements. In support of this position, defendants rely in large part upon the post-expiration presumption of arbitrability recognized by the Supreme Court in *Nolde*. The union in *Nolde* terminated the contract and four days later the employer closed the bakery and discharged all the employees. The employer rejected the union's demand for severance pay under the expired agreement and refused to arbitrate the dispute. The Supreme Court compelled arbitration holding that "the parties' obligations under their arbitration clause survived contract termination when the dispute was over an obligation arguably created by the expired agreement." *Id.* 430 U.S. at 252, 97 S.Ct. at 1072. The Supreme Court further held that "in the absence of some contrary indication, there are strong reasons to conclude that the parties did not intend their arbitration duties to terminate automatically with the contract." *Id.* at 253, 97 S.Ct. at 1073.

Among the reasons the Court offered for its holding was the parties' clear preference,

manifested in the CBA, for arbitral rather than judicial interpretation of their obligations.[24] The second reason relied upon by the *Nolde* Court was the fact that "the parties drafted their broad arbitration clause against a backdrop of well-established labor policy favoring arbitration as the means of resolving disputes over the meaning and effect of collective-bargaining agreements." *Id.* at 254, 97 S.Ct. at 1073. The Court therefore concluded:

> The parties must be deemed to have been conscious of this policy when they agreed to resolve their contractual differences through arbitration. Consequently, the parties' failure to exclude from arbitrability contract disputes arising after termination, far from manifesting an intent to have arbitration obligations cease with the agreement, affords a basis for concluding that they intended to arbitrate all grievances arising out of the contractual relationship. In short, where the dispute is over a provision of the expired agreement, the presumptions favoring arbitrability must be negated expressly or by clear implication.

*Id.* at 255, 97 S.Ct. at 1074. In essence, defendant Smith contends that this *Nolde* presumption favoring arbitrability precludes the Company's argument that his grievance was not arbitrable.[25]

The Company responds that Smith's pension grievance is not arbitrable for two reasons. First, assuming that Smith's grievance was over his entitlement to a disability pension, the Company asserts that such grievance is not arbitrable because it arose after the termination of the CBA. Second, according to the Company, Smith's grievance is not arbitrable because he is actually a participant in the Terminated Operations Plan, which did not provide for arbitration of any kind. In

---

("[F]ederal labor policy favors 'arbitration as the means of resolving disputes over the meaning and effect of collective bargaining agreements.'") (quoting *Wire Service Guild v. United Press International, Inc.*, 623 F.2d 257, 260 (2d Cir.1980)) (other citation omitted).

**24.** In this regard, the Court explained, "[t]he contracting parties' confidence in the arbitration process and an arbitrator's presumed special competence in matters concerning bargaining

agreements does not terminate with the contract. Nor would their interest in obtaining a prompt and inexpensive resolution of their disputes by an expert tribunal." *Nolde*, 430 U.S. at 254, 97 S.Ct. at 1073.

**25.** In fact, apparently Smith was so convinced that *Nolde* governed this motion, that initially he did not even bother to mention *Litton*—the Second Supreme Court case which impacts heavily on the arbitrability issue.

taking this position, the Company asserts that in *Litton* the Supreme Court "severely narrowed the *Nolde Bros.* presumption of post-expiration arbitrability." Plaintiffs' Memorandum at 11. Based upon *Litton*, the Company contends that whether Smith's pension grievance is arbitrable must be determined by examining whether that grievance "arises under" the terminated CBA and Pension Plan. *See Litton*, 501 U.S. at 205–206, 111 S.Ct. at 2225. And, for reasons which will be more fully discussed herein, the Company strongly maintains that Smith's grievance does not "arise under" those Agreements within the meaning of *Litton*.

The parties differ sharply, as the foregoing demonstrates, as to the effect of *Litton* on the presumption of post-expiration arbitrability announced in *Nolde*. The Company ardently believes, as just noted, that *Litton* "severely narrowed" that holding in *Nolde*, whereas defendant Smith claims that *Litton* is "at best, a refinement of the Court's holding in *Nolde*." Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defendants' Reply") at 8. There is no need for the court to become embroiled in that debate,[26] however, given Smith's willingness to have the arbitrability of his grievance examined in light of the *Litton* factors, which the court will now proceed to do. *See id.* at 9–10.

In *Litton*, the Supreme Court expressly stated, "[w]e agree with the approach of the [National Labor Relations] Board and those courts which have interpreted *Nolde Bros.* to apply only where a dispute has its real source in the contract." 501 U.S. at 205, 111 S.Ct. at 2225. "The object of an arbitration

clause is to implement a contract, not to transcend it." *Id.* The *Litton* Court further explained, "*Nolde Bros.* does not announce a rule that post-expiration grievances concerning terms and conditions of employment remain arbitrable." *Id.* Rather, "[t]he *Nolde Bros.* presumption is limited to disputes arising under the contract." *Id.* (emphasis added). The *Litton* Court then went on to define, as follows, the circumstances under which a post-expiration grievance can be said to arise under the contract:

[1] only where it involves facts and occurrences that arose before expiration,

[2] where an action taken after expiration infringes a right that accrued **or** vested under the agreement, or where,

[3] under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement.

*Id.* (emphasis added). According to the *Litton* Court:

Any other reading of *Nolde Bros.* seems to assume that post-expiration terms and conditions of employment which coincide with the contractual terms can be said to arise under an expired contract, merely because the contract would have applied to those matters had it not expired. But that interpretation fails to recognize that an expired contract has by its own terms released all its parties from their respective contractual obligations, except obligations already fixed under the contract but as yet unsatisfied. Although after expiration most terms and conditions of employment are not subject to unilateral change, in order to protect the statutory right to bar-

26. Since *Nolde* and *Litton* were decided, there does not seem to be a consensus among lower courts as to the impact of *Litton* on the *Nolde* presumption of post-expiration arbitrability. For example, in *Cumberland Typographical Union 244 v. The Times*, 943 F.2d 401 (4th Cir.1991), a case relied upon by the defendants, the Fourth Circuit described *Litton* as "reaffirming [the] validity of [the] *Nolde* presumption favoring arbitrability." *Id.* at 405. The district court in *Local 186 v. Guild Wineries and Distilleries*, 812 F.Supp. 1035 (N.D.Cal.1993), opined, however, that *Litton* "seriously weakened" *Nolde*'s presumption of post-expiration arbitrability. *Id.* at 1036. Indeed, the *Local 186* court ventured that the Supreme Court in *Litton* "came close to

reversing *Nolde* [.]" *Id.* At the same time though, the court in *Local 186* did acknowledge that the *Litton* Court went on "to affirm *Nolde*'s principle holding while limiting its application." *Id.* at 1036–37. "Specifically, the Court affirmed that post-expiration grievances that arise under an agreement are still subject to the agreement's arbitration clause.... However, the Court emphasized that *Nolde* only applies when the dispute has its real source in the contract." *Id.* at 1037 (citation omitted). *See also International Broth. of Teamsters v. Pepsi–Cola*, 958 F.2d 1331, 1334 (6th Cir.1992) (*Litton* "further defined under what circumstances a dispute 'arises out of' an expired agreement").

gain, those terms and conditions no longer have force by virtue of the contract.

*Id.* (citations omitted).

The issue in *Litton* was whether layoff decisions that arguably violated the terms of an expired CBA were subject to the arbitration clause found in that agreement. The Court declined to compel arbitration in *Litton*, finding, *inter alia*, that the disputed layoff provision did not create a right that vested or accrued during the term of the CBA. *Id.* 501 U.S. at 209–210, 111 S.Ct. at 2227. Nor did that provision create a contractual obligation which continued after expiration of the CBA. *Id.* In reaching this conclusion, the Court emphasized that factors such as aptitude and ability, which were to be considered in deciding the order of layoffs under the CBA, "do not remain constant, but change over time." *Id.* "They cannot be said to vest or accrue or to be understood as a form of deferred compensation[,]" such as the severance pay at issue in *Nolde. Id.*

Smith asserts that his pension dispute is arbitrable under the *Litton* standards because it satisfies at least two of the three criteria enumerated above. Specifically, Smith asserts that the Company's actions infringed on a right of Smith's which had both accrued and vested under the terms of the Pension Plan. Second, Smith maintains that the language of the Pension Plan indicates that the obligation to arbitrate survived termination of that Plan.

The Company strenuously disagrees that Smith's pension grievance is arbitrable under *Litton.* In addition to taking the contrary view as to the two *Litton* criteria just mentioned, the Company also asserts that Smith's grievance does not involve facts and occurrences that arose before the expiration of the CBA and the Pension Plan. Moreover, the Company argues that pre-*Litton* cases establish that *Nolde*'s post-expiration presumption of arbitrability "evaporate[s] if the grievance [is] not asserted within a reasonable time after contract expiration,...." Plaintiffs' Memorandum at 20. Thus, because five and a half years have lapsed between the time the CBA and Pension Plan were terminated and Smith's initial pension application, the Company contends that it had no obligation to arbitrate his grievance. The court will address these arguments *seriatim.*

Because defendant Smith does not contend that his grievance "involves facts and occurrences that arose before expiration," there is no need for the court to address that aspect of *Litton,* even though the Company did. However, given the parties' obvious disagreement as to whether either of the other two *Litton* criteria are satisfied, the court must carefully examine those two criteria in light of the particular facts of this case.

### A. Right at Issue

Before doing so, the court must define the nature of the right arbitrated. Definition of the scope of that right is necessary for two reasons. First, both of the disputed *Litton* factors are directed to the right at issue. Second, the parties appear to have differing views as to the nature of the right at issue. According to Smith, the issue which was arbitrated was his right to a pension generally. When discussing the issue of arbitrability, however, the Company defines Smith's grievance more narrowly, speaking almost exclusively [27] in terms of Smith's claim for a disability pension.[28] Thus, only after determining the precise nature of the right at

---

27. The Company makes passing reference to the fact that in its view Smith was also not eligible for a 75/80 pension, but clearly that is not the focus of its argument as to whether Smith can meet any of the *Litton* criteria. *See* Plaintiffs' Memorandum at 14–21.

28. Although, for the most part, the Company narrowly defines the right when it argues the arbitrability issue, this position is undermined by the fact that throughout the rest of its analysis the Company makes several references to the broader right of Smith's eligibility to a pension generally. For example, at the outset, the Com-

pany concedes that the issue of whether Smith was entitled "to a pension" was the subject of the grievance actually arbitrated. Plaintiffs' Memorandum at 2. Likewise, the Company concedes that "Smith's grievance and the issue as framed by the Arbitrator concerned only Smith's *eligibility* for a pension," as opposed to his *eligibility for* a particular type of pension. *Id.* at 37 (emphasis in original). Thus, it appears, insofar as the Company is concerned, that the nature of the right at issue varies depending upon what argument it desires to make at a given moment.

issue will this court be in a position to apply the *Litton* criteria to the facts before it. *See Cincinnati Typographical Union v. Gannett,* 17 F.3d 906, 907 (6th Cir.1994) ("As the legal issue before us is whether the printers' right to reproduce copy is one that is 'accrued or vested' such that it survives the expiration of a collective bargaining agreement, we must first explain exactly what that right is and how it came to be.").

Without any discussion and without citing any authority, the Company baldly asserts, "[t]he arbitrability of Smith's grievance must be determined by the grievance Smith actually filed." Plaintiff's Memorandum at 15 n. 4.[29] Also without citing any authority, defendant Smith counters, "It is well established, ..., that parties to a collective bargaining agreement may broaden the scope of a grievance upon submittal to an arbitrator." Defendants' Reply at 12 n. 24. Defendant Smith further asserts that in this case the court "must rely upon the actual submission to the arbitrator" in making the initial deter-

mination as to whether his grievance was arbitrable. *Id.* There are two weaknesses with these assertions—one substantive and the other procedural. Substantively, as just stated, the parties failed to provide any legal support for their respective positions as to where the court should look to determine the arbitrability of a given dispute.

Procedurally, neither party refers the court to any specific document or documents which it believes establishes the nature of the right Smith sought to arbitrate. This omission is particularly glaring with respect to defendant Smith because despite his contention that the court should look to "the actual submission to the arbitrator," *id.* (emphasis added), insofar as the court is able to discern, he has not supplied any such document as part of this record.[30] Moreover, various documents which are part of the record, refer only to Smith's request for a disability pension.[31] Despite this, Smith maintains on these motions that he grieved through arbitration the broader right of his eligibility to a

**29.** The Company did not, however, include in the record a copy of the grievance Smith actually filed. Nor, as will be more fully explained, did Smith provide such grievance. To further complicate matters, the parties did not specify exactly which documents the arbitrator had before him, which also may be part of the record on these motions.

**30.** Smith does refer in his original memorandum to his pension application form which purportedly lists all of the retirement options contained in the Pension Plan. Defendants' Memorandum at 13. The only retirement application form in the record, however, is blank, listing six different types of retirement options with corresponding boxes to be marked designating for which option the applicant is applying. *See* Roberts Aff., exh. K thereto. (Presumably this form is identical to the one initially submitted by Smith, although that is not absolutely certain, given the current state of the record.) Because that application was obviously not the one submitted by Smith, it is impossible for the court to tell from this particular document for which of the several listed retirement options Smith applied when completing his application.

**31.** To illustrate, in his "Request for Negotiating Employees' Grievances," when asked to provide a "statement of case," Smith wrote, "According to the pension agreement between Chicago Pneumatic Tool Co and Local Lodge 2275 I.A.M. and A.W. I have a right to appeal the companies [sic] decision to deny my request for a disability

pension." Roberts Aff., exh. D thereto (emphasis added). In that same document, when asked to state what "adjustment [he] desired," Smith wrote, "that I be granted a disability pension per the pension agreement...." *Id.* (emphasis added). (The word "granted" is not completely legible in the court's copy; given the context, the court assumes that that was the intended word.) Similarly, in several Company documents they too explicitly refer to Smith's request for a disability pension, without mentioning a request by Smith for any other type of pension. *Id.,* exhs. C, E and G thereto. Furthermore, the "Request for Arbitration Panel," signed by both the Company and the Union, indicates that the "type of issue" to be arbitrated was a "pension disability." *Id.,* exh. I thereto (emphasis added).

To be sure, in a letter to the Company, the Union did refer to the Company's refusal "to give Melvin F. Smith his pension[,]" without specifying what type of pension it was referring. *Id.,* exh. F thereto. The Union further stated, "We feel that this violates the past practice on issuing pensions once people are vested[.]" *Id.* So, based solely upon this document it could be argued that Smith was asserting his right to pension benefits generally, and not to any particular category of pension benefit. However, that conclusion would require the court to disregard the other correspondence surrounding that document indicating, as discussed above, that the subject of Smith's grievance, at least initially, was solely his eligibility for a disability pension.

pension—without specifying what form that pension might eventually take.

■ The issue of the scope of the parties' submission to an arbitrator arises most often in the context of whether the arbitrator exceeded the scope of the granted authority. In that setting, the Second Circuit has recognized, on more than one occasion, that " '[t]he 'scope of authority of arbitrators generally depends on the intention of the parties to an arbitration, and is determined by the agreement or submission.' ' " *Local 1199 v. Brooks Drug Co.*, 956 F.2d 22, 25 (2d Cir. 1992) (quoting *Synergy Gas Co. v. Sasso*, 853 F.2d 59, 63–64 (2d Cir.), *cert. denied*, 488 U.S. 994, 109 S.Ct. 559, 102 L.Ed.2d 585 (1988)) (quoting in turn *Ottley v. Schwartzberg*, 819 F.2d 373, 376 (2d Cir.1987)).[32] " 'Such an agreement or submission serves not only to define, but to circumscribe, the authority of the arbitrators.' " *Id.* (quoting *Ottley*, 819 F.2d at 376 (citation omitted)). Significantly, the parties may broaden the scope of the issues submitted for arbitration by their course of conduct during the arbitration. *See, e.g., International Chemical Workers Union, Local No. 566 v. Mobay Chemical Corp.*, 755 F.2d 1107, 1110 (4th Cir.1985) (agreement to arbitrate particular issues need not be express, but may be implied or established by the parties' conduct). Thus, a determination as to the scope of an arbitrator's authority depends upon two factors—the parties' agreement or submission, as well as their course of conduct.

■ In the present case, as previously mentioned, at this juncture the parties have not framed the issue precisely in terms of whether the arbitrator exceeded the scope of his authority.[33] Rather, according to the parties, the issue, which is to a certain extent related, is whether Smith's grievance was arbitrable in the first instance. Nevertheless, give the seeming lack of case law addressing the discrete issue of where a court should look to determine the arbitrability of a particular grievance, the court will look to the foregoing principles for guidance.

Although it is not readily apparent from the record, as previously discussed, it appears on the face of it that the submissions to the arbitrator, particularly the "Request for Arbitration Panel," indicate that the issue for arbitration was Smith's eligibility for a disability pension. Consistent with that interpretation, the arbitrator framed the first issue solely in terms of a disability pension.[34] The arbitrator did frame the second issue more broadly though: "If the grievance is arbitrable is the Grievant now eligible for a disability pension, a 75/80 pension, or early commencement of a deferred vested pension even though he was not disabled when his employment was terminated?" Roberts Aff., exh. J thereto at 8. Following the arbitrator's lead (or so it seems), it appears from the arbitration award that the parties acquiesced in what, on the face of it, amounted to a broadening of the issues submitted to arbitration.[35] Thus, not only was Smith's eligibility for a disability pension arbitrated, but also his eligibility for other types of pensions provided for under the CBA and

**32.** *See also Dighello v. Busconi*, 673 F.Supp. 85 (D.Conn.1987), *aff'd without pub'd opinion*, 849 F.2d 1467 (2d Cir.1988) ("[N]ot only the contract to arbitrate but also the parties' submission of the issues expressly empowered the Arbitration Panel to determine the rights, obligations and liabilities of the four corporate entities whose activities played major roles in the grievances presented for resolution.") (citations omitted).

**33.** The court realizes that in making its alternative argument, which will be more fully discussed later, the Company does assert that the arbitrator exceeded the scope of his authority. That is not the basis, however, of the Company's primary argument, which the court is now considering, and that is that Smith's grievance was not arbitrable because it arose after the termination of the CBA and Pension Plan.

**34.** The arbitrator framed the first issue as follows: "Is the denial of a disability pension to the Grievant an arbitrable issue?" Roberts Aff., exh. J thereto at 8.

**35.** In this regard, based upon the arbitrator's restatement of the Company's position in the arbitration award, evidently the Company articulated to the arbitrator its belief that Smith was not entitled to one of several retirement options including a disability pension. *See* Roberts Aff., exh. J thereto at 10–13. Significantly, there is no mention in the arbitration award that the Company asserted that the arbitrator's inquiry should

Pension Plan.[36] Indeed, in the end the arbitrator declined to award Smith a disability pension, but he did award him deferred pension benefits. Therefore, the court finds that even if the parties submitted only the issue of Smith's eligibility for a disability pension, the arbitrator broadened that issue to include whether Smith might be eligible for a 75/80 pension or early commencement of a deferred vested pension. What is more, at least insofar as the court is able to discern from the present record, it can certainly be implied that the parties acquiesced in the arbitrator deciding that broader issue.

Having determined that the issue before the arbitrator was Smith's eligibility for a pension, and not just a disability pension, the court will next consider, in accordance with *Nolde*, whether the parties expressly or by clear implication negated the presumption favoring arbitrability. *See Nolde*, 430 U.S. at 255, 97 S.Ct. at 1074. If the court answers that query in the negative, then it will go on to consider whether under *Litton* the disputed grievance is over a right "arising under" the terminated CBA and Pension Plan.

### B. Negation of Arbitrability Presumption

■ There is no specific clause in either the CBA or in the Pension Plan excluding from arbitration contract disputes arising after termination of those Agreements. In fact, arguably the arbitration clause contained in the Pension Plan, which specifically states that "[i]f any difference shall arise between the Company ... and any person who shall be an applicant for a pension as to ... an applicant's right to a pension," [37] evinces a contrary intent. That is, because a dispute regarding such right could not arise until an applicant applied for a pension, and such application could be received well after the termination of the CBA and the Pension Plan, as was the case with Smith, the parties intended that disputes regarding that right remained arbitrable, even after the termi-

nation of those two Agreements. This conclusion is bolstered by the fact that the arbitration clause was not limited in duration. Therefore, in the absence of any indication from the parties, either express or by clear implication, of an intent to negate the presumption favoring arbitrability, as in *Nolde*, this court assumes that the parties "intended to arbitrate all grievances arising out of the contractual relationship[.]" *Nolde*, 430 U.S. at 255, 97 S.Ct. at 1074. Thus, the court must next consider whether Smith's grievance arises under the terminated CBA and Pension Plan, which in turn involves application of the *Litton* criteria previously set forth herein.

### C. Application of Litton

#### 1. "Accrued or Vested"

Smith offers several reasons which he believes support a finding that his right to a pension "accrued or vested" pursuant to the terms of the CBA and related Pension Plan. First, Smith points to the fact that under the terms of the Pension Plan, employees were to receive a pension. He further reasons that the Pension Plan provided that bargaining unit employees, such as himself, were entitled "to a certain pension benefit for every year that they were employed by the Company." Defendants' Reply at 11. Thus, according to Smith, under the terms of those two Agreements, he was accruing a pension benefit every year he worked. *Id.* Smith further reasons that his right to an "accrued benefit under the Plan vested when the Plan was terminated." *Id.* In making this argument, Smith relies upon section XI of the Pension Plan which states, in relevant part:

> In the event of termination or partial termination of this Agreement the rights of the affected persons to their **accrued benefits** under the Agreement, to the extent then funded, **shall vest and be nonforfeitable** . . . .

be limited solely to the issue of whether Smith was eligible for a disability pension.

**36.** Once again, the court is operating at somewhat of a disadvantage because it does not have a transcript of the arbitration proceeding; nor does it have any other indication in this record as

to exactly what the arbitrator had before him in terms of testimony and extrinsic evidence, as well as submissions by the parties.

**37.** Roberts Aff., exh. B thereto at 31.

Roberts Aff., exh. B thereto at 37 (emphasis added). Relying upon this provision, Smith asserts that when the Pension Plan terminated on August 31, 1984, then, his "right to a pension vested." Defendants' Reply at 11. Thus, it is Smith's position that he accrued the right to a pension benefit while the CBA and Pension Plan were still in effect and that his right to a pension vested upon termination of the Plan. Consequently, in Smith's view, clearly this pension dispute was arbitrable.

On the other hand, the Company asserts that its denial of Smith's pension does not infringe on any right vested or accrued under the CBA; that is, it did not infringe on any right vested or accrued on or before August 31, 1984—the date the CBA, by its terms, expired. The Company points to the fact that on that date Smith was neither disabled nor was he at least 55 years old. Nor did his age and credited service at that time total eighty years. The Company further asserts that Smith "did not meet the 'conditions' for a disability or 75/80 pension when the pension plan expired on August 31, 1984, and he had no accrued or vested right to a pension of either kind on that date." Plaintiffs' Memorandum at 18. In the Company's opinion, Smith is basing his claim to a pension on "rights he might have earned if his employment had continued and if the plan had remained unchanged[;]" but neither of those events happened. *Id.*

■ After discussing the *Litton* three-prong test for determining whether a post-expiration dispute arises under a CBA, the Sixth Circuit in *Cincinnati Typographical*, stated, "[t]here are two basic ways in which the union might show us that the right is accrued or vested and thus survives the expiration of the CBA." 17 F.3d at 910. According to the Sixth Circuit, first, "a court may use standard principles of contract interpretation to determine whether a right is vested." *Id.* (citation omitted). Employing those principles, a court "might conclude [that] the parties intended a right to vest if

[the court] were shown contract language or extrinsic evidence to support that conclusion." *Id.* (citations omitted). Neither the CBA nor the extrinsic evidence persuaded the Court in *Cincinnati Typographical* that the "right to not be laid-off while reproduction is on the hook" [38] was intended to vest. There was nothing in the CBA which manifested such intent. Furthermore, the proffered extrinsic evidence demonstrating why the parties bargained for that right, did "not provide [the Court] with evidence of the intended *duration* of the right with regard to particular employees." *Id.* at 911 (emphasis in original). Third, the Court pointed out that because in an earlier agreement the parties had "limited the protection from lay-offs while reproduction was on the hook to only a few printers," that "tend[ed] to indicate that [they] viewed the right as a creature of a particular contract and not as a right vested and thus guaranteed for the future." *Id.* Thus, the Sixth Circuit was not persuaded under standard principles of contract interpretation, that the right at issue there had vested.

■ The second way in which a party may show that a given right is accrued or vested is if such right falls into the category of rights which "courts presume to be 'accrued or vested' without any other evidence in a contract." *Id.* Rights which fall into that category "are rights that can be worked toward or accumulated over time." *Id.* (citation omitted). Examples of rights which accrue or vest over time are severance pay and vacation pay. *Id.* The Sixth Circuit distinguished other rights which it described as "strictly 'creature[s] of the collective bargaining agreement and [their] life as a matter of contract does not extend beyond contract expiration.'" *Id.* (quoting *Chauffeurs, Teamsters & Helpers, Local Union 238 v. C.R.S.T., Inc.*, 795 F.2d 1400, 1404 (8th Cir.) (en banc), *cert. denied*, 479 U.S. 1007, 107 S.Ct. 647, 93 L.Ed.2d 702 (1986)). Holding that "[t]he nature of the right at issue here is

---

**38.** The term "reproduction on the hook," as the Sixth Circuit explains, "refers to advertising copy that has arrived in pre-set form and been published in the Enquirer, but which printers may nevertheless spend time duplicating even though the copy they reproduce will never be published." *Cincinnati Typographical*, 17 F.3d at 907. For a more in depth discussion of that right, *see id.* at 907–908.

not one that we presume to be vested[,]" the Sixth Circuit reasoned that the right not to be laid off while reproduction is on the hook is not accrued step-by-step as an employee works for an employer, such as was true of the severance pay in *Nolde. Id.* Instead, the Court described the right in *Cincinnati Typographical* as a "bargained-for worker protection, like the right[ ] not to be discharged...." *Id.* The Court therefore affirmed the district court's grant of summary judgment finding that the employer had no obligation to arbitrate the union's challenge relating to layoffs.

 Regardless of which of the two approaches enunciated by the court in *Cincinnati Typographical* this court employs, the result is the same. The court finds that Smith's right to a pension accrued or vested under terminated Agreements and thus such right arose thereunder in accordance with *Litton.*

Employing a contractual analysis, the court finds that these parties intended the right to a pension to vest under the circumstances of this case based upon the plain language of the Pension Plan. Unlike the CBA in *Cincinnati Typographical,* which contained no language evincing an intent to vest, as previously noted, this Pension Plan plainly states that "[i]n the event of termination ... of this Agreement the rights of the affected persons to their accrued benefits under the Agreement, to the extend then funded, **shall** vest and be non-forfeitable...." Roberts Aff., exh. B thereto at 37 (emphasis added). Furthermore, this is not a situation such as *Cincinnati Typographical* where the bargaining history or other extrinsic evidence demonstrated a contrary intent, "that is that the parties viewed the right [to a pension] as a creation of a particular contract and not as a right vested and thus guaranteed for the future." *See Cincinnati Typographical,* 17 F.3d at 911. Indeed, neither party presented any such extrinsic evidence.

Not only did Smith's right to a pension vest under the terms of the Pension Plan, but that right, like severance pay and vacation pay, which can be worked toward or accumulated over time, is in the nature of a right which courts presume to accrue or vest even in the absence of any other evidence in the contract. *See id.; see also Local Union No. 7R v. Gold Star Sausage Co.,* 713 F.Supp. 1379, 1381 (D.Colo.1989), *aff'd on other grounds sub nom. United Food & Comm. Wkrs. v. Gold Star Sausage Co.,* 897 F.2d 1022 (10th Cir.1990) ("Generally, courts view rights such as severance pay, pension plan rights, and vacation pay as having vested or accrued during the life of the agreement."); *Truckdrivers, Chauffeurs and Helpers' Local Union No. 384 v. M.G. Burdett Gas Products Co.,* No. 85–1062, slip op. at 14 (E.D.Pa. March 21, 1985) (with no discussion, court described pension benefits as involving rights accrued or vested under the CBAs).[39] Moreover, pensions are considered to be a form of deferred compensation[40] and even the Supreme Court appears to have endorsed the view, albeit implicitly, "that rights to de-

---

**39.** Pension benefits stand in sharp contrast to the right to be discharged only for just cause, seniority rights, or the right to be consulted prior to relocation, all of which courts have found to be strictly creatures of CBAs. As such, the rights just enumerated do not arise under the CBAs, and thus the obligation to arbitrate grievances concerning those rights does not extend beyond the life of the CBA. *See International Broth. of Teamsters v. Pepsi–Cola,* 958 F.2d 1331, 1334 (6th Cir.1992) (right to be discharged for just cause did not arise out of CBA because it was strictly a contract creature, and so there was no obligation on the part of the employer to submit grievance to arbitration under the CBA); *Amalgamated Clothing & Textile Workers v. Stanbury,* 811 F.Supp. 464, 467–468 (E.D.Mo.1992) (right to be consulted prior to plant relocation "strictly a creature of the Agreement[,]" and thus could not vest or accrue prior to contract termination); and *United Paperworkers Intern. v. Boise Cascade,* 758 F.Supp. 954, 961 (D.Vt.1991) (seniority rights did not survive contract termination and thus there was no post-contract obligation to arbitrate a grievance concerning the same); and *Cadillac Industries v. Amalgamated Clothing Union,* 775 F.Supp. 30, 33 (D.Puerto Rico 1991) (right to be discharged only for just cause was creation of CBA and did not extend beyond expiration of agreement, and thus discharge effectuated after termination of CBA was not arbitrable).

**40.** *See Johnson v. Georgia–Pacific Corp.,* 19 F.3d 1184, 1190 (7th Cir.1994) (explaining in the context of ERISA litigation that "[p]ensions are deferred compensation[ ]").

ferred compensation are ordinarily 'vested' or 'accrued' by contract." *Carr v. First Nationwide Bank*, 816 F.Supp. 1476, 1491 n. 9 (N.D.Cal.1993).[41]

Third, in the court's opinion, defendant Smith's right to a pension vested or accrued under the terminated Agreements because acts securing that right, such as his accumulation of time toward that right, occurred prior to that termination. *See Amalgamated Clothing & Textile Workers v. Stanbury*, 811 F.Supp. 464, 467 (E.D.Mo.1992) (citing *C.R.S.T., supra*, 795 F.2d at 1403–1404 (collecting cases)). For all of these reasons, the court finds that Smith's right to a pension accrued or vested under the terminated Agreements, and as such that right arises under those terminated Agreements for purposes of applying the presumption of post-expiration arbitrability. Consequently, as the Sixth Circuit explained, based upon *Litton*, "[o]nce it is determined that a grievance arises under a contract, the policy favoring arbitration makes it 'presume[d] as a matter of contract interpretation that the parties did not intend a pivotal dispute resolution provision to terminate for all purposes upon the expiration of the agreement.'" *See Cincinnati Typographical*, 17 F.3d at 910 (quoting *Litton*, 501 U.S. at 207–208, 111 S.Ct. at 2226).

■■■ The Company seeks to avoid this finding by relying upon the definitions of "accrued benefit," "normal retirement benefit," and "nonforfeitable" found in ERISA. Based upon those statutory definitions, the Company contends that a disability pension does not accrue during active service; nor does it "become 'unconditional,' and thus does not become 'nonforfeitable,' until the

employee qualifies for it and begins to receive it." Plaintiff's Memorandum at 17–18 n. 5. Thus, asserts the Company, "[u]ntil [an employee] qualifies, the benefit can be taken away by negotiation, amendment, expiration or termination of a benefit plan." *Id.* at 18 n. 5. Although the Company does not state it in precisely these terms, evidently, based upon the foregoing, it believes that Smith's right to a disability pension did not accrue or vest under either of the terminated Agreements. Perhaps there might be some validity to the Company's position if the right at issue was Smith's right to a disability pension. The court has already rejected the view that the subject of Smith's grievance was so limited, however.

Moreover, in the court's view, whether a given right has "vested" or "accrued" within the meaning of ERISA presents a different issue, implicating different concerns, than the issue of whether such right has "vested" or "accrued" so as to support a finding that such right arose under a contract within the meaning of *Litton*. In the former situation, the need for narrowly crafted definitions of accrual and vesting is easier to see, given the nature of the statutory protection afforded such rights under ERISA. Taking a restrictive view of what constitutes a vested or accrued right for purposes of deciding whether a labor dispute is arbitrable would contradict the strong national policy favoring arbitration, however. Thus, the court declines to follow the ERISA-oriented approach urged by the Company.[42]

### 2. *Survival of Expiration*

Because the court has determined that Smith's right to a pension arose under the

**41.** As the *Carr* court persuasively reasoned, the Supreme Court's implicit recognition of that proposition can be found in the fact that the *Nolde* Court "discussed the plaintiff union's analogy of severance benefits to deferred compensation as a potential ground for finding that the severance benefits were vested or accrued." *Id.* (citing *Nolde*, 430 U.S. at 243, 97 S.Ct. at 1067). Along the same lines, "[i]n *Litton*, the court considered a similar argument that the layoff provisions of a collective bargaining agreement were analogous to deferred compensation, and therefore gave rise to rights which were contractually 'vested' or 'accrued', insofar as such provisions emphasized employee seniority." *Id.* (citing *Lit-*

*ton*, 501 U.S. at 209–210, 111 S.Ct. at 2227). ("The [*Litton*] Court rejected this latter analogy on the ground that seniority was only a secondary factor considered under the particular layoff provisions involved." *Carr*, 816 F.Supp. at 1491 n. 9 (citing *Litton*, 501 U.S. at 209–210, 111 S.Ct. at 2227)).

**42.** As an aside, the court notes that it might be permissible to look to ERISA for guidance if the terminated Agreements were absolutely silent on the issue of vesting, but as mentioned earlier, they were not.

terminated Agreements because it accrued or vested thereunder, there is no need for the court to consider to consider the third *Litton* scenario—whether under normal principles of contract interpretation his pension rights survive termination of the Agreements.[43]

### D. Timeliness of Grievance [44]

■ As an additional basis for challenging the arbitrability of Smith's grievance, the Company asserts that even if his grievance arose under the terminated Agreements, he still would not be able to avail himself of the *Nolde* presumption of post-expiration arbitrability because that presumption "evaporated" in that Smith did not seek a pension until five and a half years after the expiration of those Agreements. Plaintiffs' Memorandum at 20. In support of this position, the Company relies upon *United Paperworkers Intern. v. Wells Badger Ind.*, 835 F.2d 701 (7th Cir.1987), *C.R.S.T.*, 795 F.2d 1400, and *dicta* in *Local 703, Intern. Broth. of Teamsters v. Kennicott*, 771 F.2d 300 (7th Cir.1985), all of which, incidentally, were decided prior to

*Litton.* Defendant Smith responds that this timeliness argument is a "red herring" in that he filed his grievance immediately after receiving the Company's decision denying his pension request. Defendants' Reply at 14 n. 26.

■ The court disagrees with the Company's assertion that defendant Smith should not be allowed to rely on the *Nolde* presumption of arbitrability due to the passage of time between the termination of the subject Agreements and Smith's request for a pension. Insofar as the cases upon which the Company relies are concerned, the court finds that none of them support the Company's position. The Court in *United Paperworkers* flatly rejected the Union's argument that its post-contract grievance must be arbitrated in accordance with *Nolde.* 835 F.2d at 705. In so doing, the Court made no mention of whether the timeliness of the Union's grievance played any part in its decision; and thus that case is of questionable relevance to the narrow issue of timeliness presented by the Company in this case. In

---

**43.** When addressing this issue, rather than concentrating on whether Smith's right to a pension survived termination of the CBA and Pension Plan, defendants concentrate on whether the Company's obligation to arbitrate survived termination of those Agreements. In the court's view, that is a different, albeit, related issue.

**44.** Recognizing that some courts have indicated that the issue of the timeliness of a request for arbitration is an issue of procedural arbitrability, and thus improper for consideration by the courts, *see, e.g., T & G Const. v. Sheet Metal Workers', Local 100,* 791 F.Supp. 127, 133 (D.Md. 1992) (whether request for arbitration unreasonably delayed is "perhaps" issue for the arbitrator); *Local 682 v. Ed Jefferson Contracting, Inc.,* 768 F.Supp. 691, 696 n. 10 (E.D.Mo.1991); and *Keystone Shipping v. Masters, Mates & Pilots,* 671 F.Supp. 367, 374 (D.Md.1987), this court will address that issue nonetheless. There are several reasons why the court has decided that this issue is appropriate for its consideration. First, none of the parties have even hinted that this court should decline to address the timeliness issue. Second, the issues surrounding the reasonableness of the Union's alleged delay in initiating arbitration are not "**'intimately** intertwined'" with the merits of the underlying dispute. *See T & G Const.,* 791 F.Supp. at 132 (quoting *Keystone Shipping,* 671 F.Supp. at 374) (emphasis added).

Furthermore, relying upon *dicta* in *Nolde,* which will be more thoroughly discussed above,

courts have considered the timeliness of a request for arbitration when that issue is raised, as it is here, in terms of whether a party may rely upon the presumption of arbitrability recognized therein. *Hotel and Restaurant Employees, Local 703 v. Williams,* 752 F.2d 1476, 1479 (9th Cir. 1985); *Federated Metals Corp. v. United Steelworkers,* 648 F.2d 856, 862 (3rd Cir.), *cert. denied,* 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981). Furthermore, it is appropriate for this court, rather than an arbitrator, to address the issue of timeliness because the court is doing so in conjunction with its decision of whether to apply the *Nolde* post-expiration presumption of arbitrability. In the court's view, that issue differs from the issue of whether arbitration was timely filed in accordance with the terms and conditions of a CBA. In the latter setting, it is easier to see why the arbitrator should address the timeliness issue in the first instance. However, where, as here, the timeliness issue is presented in the context of the effect of the *Nolde* presumption of arbitrability on the employer's obligation to arbitrate, there is no sound reason why the court should decline to address this issue, which is so obviously bound up with the arbitrability issue—an issue which clearly is properly before this court. *See Bevona, supra,* 27 F.3d at 39; and n. 12. Thus, because the court believes that under the particular facts of this case, it is in the best position to decide the timeliness issue, it will proceed to do so.

*C.R.S.T.*, the second case cited by the Company, the Court simply observed in passing that "[t]he passage of more than one year between the expiration of the contract and the employee's discharge also makes application of the *Nolde* presumption of doubtful propriety." 795 F.2d at 1404. That *dicta*, from the Eighth Circuit, clearly is of extremely limited precedential value here.

In *Kennicott*, the final case referenced by the Company, the Seventh Circuit stated, "[w]e do not read the *Nolde* presumption of arbitrability to persist indefinitely after expiration." 771 F.2d at 303. Distinguishing *Nolde*, where "the event triggering the severance-pay grievance (the closing of the plant) occurred four days after the expiration of the contract," the *Kennicott* Court explained, "the events triggering the grievances (the discharge and the granting of retroactive pay increases) occurred more than six months after the Agreement expired[,]" and thus it found that those grievances were not arbitrable. *Id.* at 303 and 304. The Court explained, "[a]lthough it may be reasonable to presume that parties intend to arbitrate grievances arising shortly after the expiration of a contract, the presumption weakens as the time between expiration and grievance events increases." *Id.* at 303.

*Kennicott* is readily distinguishable on its facts, however, from the present case. Unlike *Kennicott*, the pension grievance at issue in this case concerns rights which accrued under the terminated Agreements, so that the *Nolde* presumption applies even if the grievances arose after six months from the expiration of the collective bargaining contract. *See Chicago Web Pr. Pressmen's Un. v. Chicago Tribune*, 657 F.Supp. 351, 355 (N.D.Ill.1987). In *Chicago Web*, the court was presented with a timeliness issue remarkably similar to the timeliness issue in this case. The issue was "whether *Nolde's* presumption of post-expiration arbitrability applies to a dispute involving accrued rights under a collective bargaining agreement where the dispute was not triggered until some five months after the expiration of the agreement." 657 F.Supp. at 355. The issue sought to be grieved in *Chicago Web* was

calculation of vacation pay. The Union contended that because vacation time was earned in one year, but payable the following year, the proper vacation pay rate was the hourly rate at the time the vacation pay was earned, whereas the employer was seeking to pay a lesser rate based upon the employees' status at the time they earned the vacation.

When faced with the issue of whether that grievance was arbitrable, despite the fact that the events giving rise to such grievance occurred five months after the expiration of one CBA and thirteen months after the expiration of another, the court found that they were. The first justification for the court's holding was "that *Kennicott* cannot be read to preclude *Nolde's* presumption of arbitrability when the dispute involves a right that accrued under the terms of a collective bargaining agreement but did not ripen until sometime after the agreement expired." *Id.* (citing *Federated Metals, supra*, 648 F.2d at 862). The court further reasoned, "*Kennicott* must be distinguished in this context because it did not involve rights that had accrued under the expired agreement, which could be considered to some extent as 'owed' to employees." *Id.* (citation omitted). Lastly, the court soundly reasoned that "[t]o hold otherwise would vitiate *Nolde* by limiting the presumption of post-expiration arbitrability to disputes that arise directly after the expiration of the agreement, regardless of the nature of the right involved." *Id.*

So, once again, it is the nature of the right involved which is determinative. And here, that right—to a pension—involves a right which, to some degree, vested or accrued under the terminated Agreements, but did not fully ripen until after their expiration. Consequently, because of this fundamental distinction between *Kennicott* and the present case, this court is not compelled to follow *Kennicott*.

Furthermore, the present case can be likened to *International Union, supra*, wherein the Seventh Circuit (the same Court which decided *Kennicott*), found that the presumption of arbitrability was not undermined by the fact that the grievance does not arise until at least six months after the expiration of the CBA. The Court distinguished *Kenni-*

*cott* on the basis that the events which triggered the arbitration issues in *International Union* "were the employer's announcements that certain allegedly accrued rights would not be awarded." 904 F.2d at 10 (citation omitted). Similarly, the event which triggered the arbitration herein was the Company's denial of plaintiff's pension application, which right had accrued under the terminated Agreements.

An additional reason for finding that defendant Smith's request for arbitration was timely, even though it was made after termination of the Agreements, is that this claimed delay was not unreasonable. The Union sought arbitration only six days after being advised that under step three of the grievance procedure the Company was denying Smith's grievance. *See* Roberts Aff., exhs. G and H thereto. Thus, under the particular facts of this case, the court cannot find that the Union unreasonably delayed in seeking arbitration of Smith's grievance. *See Federated Metals,* 648 F.2d at 862. ("[T]he proper inquiry is whether the union delayed unreasonably in asserting the disputed claims."). Finally, the court's holding today that defendants did not unreasonably delay in seeking arbitration is consistent with the court's recognition in *T & G Const.,* that "[c]ourts certainly should not routinely hold that requests for arbitration have been unreasonably delayed[.]" 791 F.Supp. at 133.

### E. Terminated Operations Plan

 The final ground urged by the Company as to why Smith's grievance is not arbitrable, and thus must be vacated, is that he was a participant in the Terminated Operations Plan. Unlike the Pension Plan, the Terminated Operations Plan contains no grievance and arbitration procedure. Effective December 31, 1984, inactive participants of the prior Pension Plan, such as defendant Smith, along with other of the Company's pension plans, "were 'spun off' or transferred into The Terminated Operations Plan...." Moore Aff. at ¶ 2. Thus, according to the Company, this is even a stronger case for non-arbitrability than *Nolde, Litton* and their progeny because, in contrast to those cases, after the Agreements terminated here, that void was filled by the Terminated Operations Plan, which did not provide for arbitration of any type of dispute.

Defendant Smith responds in several ways to this argument. First, even if he is a member of the Terminated Operations Plan, his entitlement to a pension benefit is not defined by that Plan, but rather is defined under the original Pension Plan, which expressly provides for arbitration of disputes regarding an applicant's right to a pension. Defendant Smith also points out that the Terminated Operations Plan allegedly is not in compliance with ERISA in that it does not afford a reasonable opportunity for a full and fair review of denial of a party's claim.[45] Therefore, according to Smith "[t]o be in compliance with the provisions of ERISA, ..., the Retirement Board must be considered to have adopted the grievance and arbitration procedure contained in the [Pension] Plan." Defendants' Reply at 15 (footnote omitted). Lastly, defendant Smith asserts that the Company's actions in the handling of his grievance and arbitration belie its claim that Smith is not covered by the Pension Plan. In particular, Smith points out that his pension application was submitted on a form entitled "Retirement Plan for IAM, Employees of Chicago Pneumatic Tool Company," listing retirement options under the Pension Plan; and the Company's initial denial was signed by James E. Hoover, a member of the Board responsible for administration of the Pension Plan. It was not signed by the Company's Retirement Plan Committee. Furthermore, neither on the denial of Smith's initial application, nor on the subse-

---

**45.** ERISA mandates the following claims procedure for employee benefit plans. Such plan "shall—
 (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
 (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."
 29 U.S.C. § 1133 (West 1985).

quent grievance denials did the Company ever suggest that it was denying his grievance because the Terminated Operations Plan contained no disability pension provision. This combination of factors, in Smith's view, leads to the inescapable conclusion that even the Company believed that the Pension Plan governed Smith's entitlement to a pension; and thus his pension dispute is arbitrable.[46]

The Company devotes much of its argument to explaining why the Terminated Operations Plan contains no arbitration provision. As sound as those reasons may be, this argument is not particularly germane to the issue of whether Smith's pension dispute, which arose under the earlier Pension Plan, is arbitrable. Assuming *arguendo* that Smith is a member the of the Terminated Operations Plan, the fact remains, as already discussed at length, that his right to a pension arose under the Prior Plan. This conclusion is buttressed by the fact that except section four,[47] the Terminated Operations Plan makes no mention of when a member may receive such benefit; nor does it mention the amount a member may receive. Thus, the court agrees with Smith that "[n]otwithstanding the fact that [he] may be a member of the Terminated Operation Plan, the dispute concerning this entitlement to a pension is subject to arbitration."[48] Defendants' Memorandum at 12.

Because of the obvious factual distinctions between *Maxwell MacMillan Co., Inc. v. District 65, UAW*, 790 F.Supp. 484 (S.D.N.Y. 1992), the only case cited by the Company in support of this argument, and the present case, the court does not read that case as mandating a different result here. The Court in *Maxwell* found that the employer and union had created an interim agreement, which MacMillan, the employer's successor, was bound to follow, including the arbitration clause. *Id.* at 486. Having reached that conclusion, the court declined to discuss the parties' arguments as to their obligations under the expired CBA. *Id.* In all likelihood, the court did not address the issue of a post-expiration duty to arbitrate because, in keeping with the national policy favoring arbitration in the field of labor relations, the court was able to find such duty under the successor agreement.

There is one additional reason which cannot be ignored as to why Smith's grievance is arbitrable even if he is a member of the Terminated Operations Plan; and that is the fact, as Smith steadfastly maintains, that the Company's consent to arbitrate may be implied from its conduct. *See Wall Street Associates, L.P. v. Becker Paribas Inc.*, 27 F.3d 845, 850 (2d Cir.1994) (citation omitted). As already described, the Company's assertion that Smith's grievance is not arbitrable because he is a member of the Terminated Operations Plan is relatively recent, in that the Company processed Smith's grievance right along without seeking to avoid the same based upon his asserted status as a member of such Plan.[49] For all of these reasons, the court rejects the Company's argument that

---

**46.** Alternatively, defendant Smith suggests that the court specifically find that the Terminated Operations Plan is not in conformity with ERISA in that it does not contain a claims appeals procedure or it failed to inform either Smith or the Union of such procedure, if it exists. Defendants' Reply at 15 n. 28. The court declines this invitation. There are enough issues which this court must necessarily resolve without becoming sidetracked on an ancillary issue which the parties did not fully brief, and which is not critical to deciding these motions.

**47.** That section of the Terminated Operations Plan states in relevant part:

Each other member shall be entitled to received [sic] a benefit under the terms of this Plan at such time and in such manner as determined under the provisions of this Plan

and, to the extent not inconsistent therewith, under the Prior Plan as in effect on December 31, 1984;....

Moore Aff., exh. A thereto.

**48.** The court observes that had it found that Smith's grievance was not arbitrable under the *Litton* criteria, then this argument as to the nonarbitrability of disputes arising under the Terminated Operation Plan would, perhaps, have provided additional support for such a finding. Because the court has found, however, that Smith's grievance was arbitrable, the Company's argument that Smith is a member of the Terminated Operation Plan, standing alone, is insufficient to overcome that finding of arbitrability.

**49.** Eventually the Company did make this argument before the arbitrator though. *See* Roberts Aff., exh. J thereto at 10–11.

Smith's grievance is not arbitrable because he was a participant in the Terminated Operations Plan.

To summarize with respect to the issue of arbitrability, which despite what the Company says is anything but simple,[50] defendant Smith's right to a pension was arbitrable. That grievance was arbitrable even though the CBA and Pension Plan terminated because such grievance arose under those Agreements in that the disputed pension right accrued or vested thereunder. Consequently, there is no basis for vacating the arbitration award, as the Company would like, because the Agreements which provided for arbitration had been terminated.

## V. Review of Arbitration Award

The court's analysis cannot end here, however, because in the alternative the Company is arguing that the arbitration award must be vacated because it does not "draw its essence" from the Terminated Operations Plan and because the arbitrator exceeded the scope of his authority. Defendant Smith tersely responds that the award did draw its essence from the Pension Plan in that the arbitrator found that the language of the 75/80 Plan provisions entitled Smith to an unreduced pension, and such interpretation is reasonable. Furthermore, the arbitrator did not exceed the scope of his authority according to Smith because the issue of Smith's entitlement to a pension is subject to arbitration under the plain language of the Pension Plan. Defendant Smith thus believes that the award must be confirmed.

### A. Standard of Review

The parties to this action do not dispute that the court's review of an arbitration award is "quite limited." *See Brooks Drug Co., supra*, 956 F.2d at 24 (citations omitted). As the Supreme Court plainly stated in *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987), "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he com-

mitted serious error does not suffice to overturn his decision." *Id.* at 38, 108 S.Ct. at 371. Elaborating upon this standard, the *Misco* Court further explained:

> Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. The same is true of the arbitrator's interpretation of the contract. The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract....

*Id.* at 37–38, 108 S.Ct. at 370–371 (citation omitted). The following amply demonstrates just how limited a court's review of an arbitration award is in a case such as this where, *inter alia*, the arbitrator's interpretation of the CBA is challenged: " '[T]he court is forbidden to substitute its own interpretation **even if convinced that the arbitrator's interpretation was** not only wrong, but **plainly wrong.'** " *Brooks Drug*, 956 F.2d at 25 (quoting *Chicago Typographical Union No. 16 v. Chicago Sun–Times, Inc.*, 935 F.2d 1501, 1505 (7th Cir.1991) (other citation omitted)) (emphasis added). Based upon these principles, the Second Circuit has indicated that a reviewing court's inquiry is twofold: "[It] must determine first whether the arbitrator acted within the scope of his authority, and second whether the award draws its essence from the agreement or is merely an example of the arbitrator's own brand of justice." *Id.* (citations omitted).

In the present case, the Company maintains that the arbitrator exceeded the scope of his authority because, in contravention of

50. *See* Plaintiffs' Memorandum at 10.

**128**

the CBA's arbitration clause, he did not base his decision "[u]pon the provisions of this Agreement at the time the grievance was initiated...."[51] Roberts Aff., exh. A thereto at 30. The just quoted language, in the Company's view, required the arbitrator to look only at the Terminated Operations Plan which it claims was in effect on March 21, 1990—the day Smith initiated his grievance. Because the arbitrator did not look to that Plan, the Company asserts that, necessarily, the award did not "draw its essence" from the Terminated Operations Plan. The second way in which the Company claims that the arbitrator exceeded the scope of his authority is that even if the terms of the Pension Plan were relevant, he dismissed the plain language of such Plan by "substituting" in section three of the Pension Plan the word "pensioner" for the word "employee." *See id.,* exh. J thereto at 19. The effect of this substitution will be more fully explained herein. Suffice it to say for now that according to the Company, by engaging in this substitution, the arbitrator violated the arbitration clause's prohibition against amending or modifying the CBA.[52] Defendant Smith did not respond to these contentions in any meaningful way, except, as already noted, to baldly assert that the arbitrator reasonably interpreted the Pension Plan provisions.

■ There is no merit to the Company's first argument that the arbitrator exceeded the scope of his authority by relying upon the terms of the original Pension Plan, rather than relying upon the Terminated Operations Plan. In making this argument, as previously alluded to, the Company relies upon the CBA's arbitration clause. When quoting from article XXIII of that Agreement, however, the Company effectively rewrote the arbitration clause by stating that the arbitrator did not rely "upon the provisions of th[e] Agreement in effect at the time the grievance was initiated...." Plaintiffs' Memorandum at 26 (emphasis added). That section actually states that the arbitrator's deci-

sion "must be upon the provisions of this Agreement at the time the grievance was initiated...." Roberts Aff., exh. A thereto at 30 (emphasis added). Obviously the reference to "this Agreement" refers to only one thing—the CBA; and it is that Agreement to which the arbitrator looked in making his award.

Furthermore, although due to its termination, arguably the CBA was not "in effect" when Smith filed his grievance, that does not obviate the arbitrator's obligation to look to that Agreement because Smith's grievance arose thereunder. Despite the Company's assertion to the contrary, nothing in the CBA, upon which the Company relies to establish the scope of the arbitrator's authority, requires the arbitrator to look to the Terminated Operations Plan. In any event, such requirement, if it existed, would make no sense where, as here, the right subject to arbitration did not arise under the Terminated Operations Plan.

■ To determine whether, as the Company suggests, the arbitrator impermissibly modified the CBA, it is necessary to contemplate the "substitution" made by the arbitrator. As the Company explains it, albeit it none to clearly, when the arbitrator substituted the word "pensioner" for the word "employee" in section three ("Special Early Retirement Under the 75/80 Formula") of the Pension Plan, it had the following effect:

> Under section II(4) of the [Pension] Plan ("Deferred Vesting Amount"), The pensioner may elect to have the benefits commence: ... (c) at an earlier age [than 60] pursuant to section III, provided that the pensioner satisfies the other criteria of Section III.... The other criteria of Section III include the condition that only an employee is eligible for 75/80 retirement. The Arbitrator's rewrite of employee as pensioner not only amends Section III, but

51. In that regard, article XXII, section 7 of the CBA more fully provides, in relevant part:
 The decision of the Arbitrator must be upon the provisions of this Agreement at the time the grievance was initiated and shall be final and binding on both parties.

Roberts Aff., exh. A thereto at 30.

52. Article XXIII, section 7(b) of the CBA expressly provides: "In no event can the Arbitrator add to, change, or modify the Agreement." Roberts Aff., exh. A thereto at 30.

reads the provision right out of Section II(4).

Plaintiffs' Memorandum at 27–28 (internal quotations and citations omitted).

The court has carefully considered this argument by the Company, as well as the arbitrator's analysis of Smith's entitlement to a deferred vested pension. *See* Roberts Aff., exh. J thereto at 15–20. Given the extremely deferential nature of this court's review of the arbitration award, the court is unable to find that the arbitrator committed a serious error. In accordance with the Supreme Court's teaching in *Misco,* the arbitrator "arguably constru[ed] or appl[ied]" the CBA and attached Pension Plan and thus, even if this court disagrees with the arbitrator's interpretation of those Agreements, that is not a proper basis for vacating the arbitration award. *See Misco,* 484 U.S. at 38, 108 S.Ct. at 371. "[H]aving authorized the arbitrator to give meaning to the language of the [A]greement[s], [this] court should not reject [this] award on the ground that the arbitrator [may have] misread the contract[.]" *See id.* (citation omitted). What is more, notwithstanding the Company's protestations to the contrary, this is not a situation where the arbitrator ignored the plain language of the Agreements. Rather, he simply read the Pension Plan so as to give meaning to all of its provisions—another basic tenet of contract construction. *See Kidder, Peabody & Co. v. Zinsmeyer Partnership,* 41 F.3d 861, 864 (2d Cir.1994) (citation omitted). Finally, as the Second Circuit recently reiterated, "the arbitrator need only explain his reasoning 'in terms that offer even a **barely colorable justification** for the outcome reached.'" *Burns, supra,* 47 F.3d at 17 (2d Cir.1995) (emphasis added) (quoting *Andros Compania Maritima, S.A. & Marc Rich & Co.,* 579 F.2d 691, 704 (2d Cir.1978)). "'[I]f a ground for the arbitrator's decision can be inferred from the facts of the case, the award should be confirmed.'" *Id.* (quoting *Sobel v. Hertz, Warner & Co.,* 469 F.2d 1211, 1216 (2d Cir.1972)). Certainly the arbitrator's decision in this case satisfies that minimal showing.

Last, because the court has determined that the arbitrator was under no contractual obligation to consult the Terminated Operations Plan, it follows that the court likewise rejects the Company's related assertion that the award fails to "draw its essence" from that Plan. This is not, in the court's opinion, an "example of the arbitrator's own brand of justice." *See Brooks Drug,* 956 F.2d at 25. Accordingly, try as it might, the Company simply is unable to convince the court that the arbitration award in this case should be vacated, either because the arbitrator exceeded the scope of his authority or because the award did not draw its essence from the Terminated Operations Plan. To the contrary, the court finds no basis for vacating the arbitrator's award, particularly given the limited and deferential scope of the court's review. Therefore, the court must grant the defendants' motion insofar as they are seeking, by their counterclaim, confirmation of the arbitration award.

## VI. ERISA

### A. Standing

As mentioned at the outset, defendant Smith has been receiving monthly pension benefits reduced in accordance with an actuarial equivalent table which is attached to the Terminated Operations Plan. *See* Roberts Aff., exh. K thereto. Evidently those benefits have been further reduced to reflect the survivorship aspect of the same. *Id.* Defendant Smith maintains, however, that under the arbitration award he is entitled to an unreduced pension. Despite this claim, the only relief Smith specifically seeks in his counterclaim, which is based exclusively on section 301 of the LMRA, is an order confirming the arbitrator's award and denying plaintiffs' application to vacate that same award. *See* Answer at 8, ¶ 33, and 10, ¶ d. In what the court deems to be a reversal of roles, in their first cause of action, which is based upon ERISA, as the court reads it, plaintiffs are seeking to resolve the issue of the amount of Smith's pension. In particular, they are seeking "[a]n order declaring that the Board's determination of the amount of pension payable to Defendant Melvin Smith is correct and in full compliance with the terms of the Terminated Operations Plan and the Prior Plan." Complaint at 5, ¶ 24. Defendant Smith responds that plaintiffs, as

fiduciaries, lack standing to bring this ERISA cause of action and thus it should be dismissed.

In arguing lack of standing, defendant Smith cites to 29 U.S.C. § 1132(a)(1). Plaintiffs are quick to respond that they are relying upon 29 U.S.C. § 1132(a)(3), however, and not upon section 1132(a)(1). Therefore, in considering the standing issue, the court will limit its inquiry to whether plaintiffs have standing under 29 U.S.C. § 1132(a)(3).

 Section 1132(a) of ERISA is entitled "[p]ersons empowered to bring a civil action[.]" 29 U.S.C. § 1132(a) (West 1985). Subdivision three of that section reads as follows:

A civil action may be brought— ... (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter ["Protection of Employee Benefit Rights"] or the terms of the [pension] plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter ["Protection of Employee Benefit Rights"] or the terms of the [pension] plan; ...

Id. "Section 1132 is essentially a standing provision: it sets forth those parties who may bring civil actions under ERISA and specifies the types of actions each of those parties may pursue." Gulf Life Ins. Co. v. Arnold, 809 F.2d 1520, 1524 (11th Cir.1987). Section 1132's standing provision "must be construed narrowly; civil actions under ERISA are limited only to those parties and actions Congress specifically enumerated in section 1132." Id. (emphasis added) (citations omitted). In considering the parties' respective standing arguments, the court will keep in mind this narrow manner in which section 1132 must be construed.

As the plain language of section 1132(a)(3) makes clear, there are essentially two prerequisites to establishing standing thereunder. First, a plaintiff must show that he or she is either "a participant, beneficiary, or fiduciary." Second, there must be a showing that the action is of the type section 1132(a)(3) specifically allows. As to the first element, plaintiffs are bringing this ERISA claim as fiduciaries, and defendant Smith

does not dispute that. Instead, Smith focuses on the second element of section 1132(a)(3) standing—the nature of plaintiffs' ERISA action. In particular, he contends that as fiduciaries plaintiffs cannot bring an action to determine his rights, as a plan participant, under the Pension Plan. It is that issue with which the court is primarily concerned at this juncture.

Attempting to bring this action within the ambit of section 1132(a)(3)(B), the Company posits that if Smith had sought declaratory or injunctive relief to insure that he would receive an unreduced monthly pension, such action would be equitable. Describing their ERISA cause of action as "the declaratory inverse" of that hypothetical, plaintiffs contend that such action is also equitable and thus they have standing. Plaintiffs' Memorandum at 34. The question thus becomes whether plaintiffs' ERISA cause of action is an action to obtain equitable relief within the meaning of section 1132(a)(3)(B). After closely examining plaintiffs' ERISA cause of action, as well as the relevant case law, the court is persuaded that it is not such an action.

### 1. Equitable Relief

 "Suits for declaratory judgment are a statutory creation enacted by Congress in the Declaratory Judgment Act, ..., and are neither inherently legal nor equitable in nature." Gulf Life, supra, 809 F.2d at 1523 (citing American Safety Equip. Corp. v. J.P. Maguire & Co., 391 F.2d 821, 824 (2d Cir. 1968)). To determine whether a given declaratory judgment action is legal or equitable, "courts have examined the basic nature of the issues involved to determine how they would have arisen had Congress not enacted the Declaratory Judgment Act." Id. (internal quotations and citations omitted). Here, the plaintiff fiduciaries are seeking a declaration that the Pension Plan Board correctly determined the amount of defendant Smith's pension under the Terminated Operations Plan and under the original Pension Plan. Thus the underlying controversy is basically one of contract interpretation, which is legal, and not equitable; and as such is not the

type of claim section 1132(a)(3)(B) authorizes. *See Memorial Hosp. for Cancer & Allied Diseases v. Empire Blue Cross & Blue Shield,* 93 Civ. 6682, 1994 WL 132151, 1994 U.S.Dist. LEXIS 4670 (S.D.N.Y. April 11, 1994) (and cases cited therein) (insurer's declaratory judgment action seeking to uphold its interpretations of its rights and obligations under an ERISA-covered plan, to validate its refusal to pay for treatments rendered under that plan, legal and not equitable claim for purposes of section 1132(a)(3)).

Additional support for the court's finding that plaintiffs' ERISA cause of action herein is equitable can be found in two Circuit Court decisions. The Ninth Circuit in *Transamerica Occidental Life Ins. Co. v. DiGregorio,* 811 F.2d 1249 (9th Cir.1987), found that an action seeking a declaration of an insurer's obligation under an ERISA covered policy was not equitable. *Id.* at 1251.[53] In a similar vein, the Eleventh Circuit in *Gulf Life* held that a fiduciary's declaratory judgment action, seeking to determine its liability for benefits claimed by a former employee, who was a participant in an ERISA benefit plan, was not a suit for equitable relief. *Gulf Life,* 809 F.2d at 1523. Therefore, because plaintiffs' ERISA cause of action is not equitable in nature, they are not entitled to rely upon the standing provision contained in section 1132(a)(3)(B). Moreover, because there are no allegations that defendants violated any provision of ERISA[54] or the Pension Plan terms, even assuming that plaintiffs are seeking equitable relief, they still have not fully satisfied section 1132(a)(3)(B). *See Woods v. Twyman,*

93 C 6373, 1993 WL 462849, at *1, 1993 U.S.Dist. LEXIS 15871, at *2 (N.D.Ill. Nov. 8, 1993) ("Sections 1132(a)(3)(A) and 1132(a)(3)(B)(i) do not apply here because there is no allegation that Defendants violated ERISA or the terms of the plan.").

### 2. *Enforcement*

■ Even though plaintiffs are not claiming that their ERISA cause of action may also be characterized as one to "enforce" an ERISA provision or to "enforce" the terms of the Pension Plan, because that type of action may, in certain situations, confer standing under section 1132(a)(3), in analyzing plaintiffs' standing, the court will also consider that possibility.

Assuming for the sake of argument that plaintiffs' ERISA claim is equitable, clearly such claim is not seeking to "enforce" an ERISA provision or a term of the Pension Plan. In both *Gulf Life* and *Transamerica,* the Courts found that a fiduciary who brings an action for a declaratory judgment that a participant is not entitled to certain benefits is not seeking to "enforce" an ERISA provision or a Plan term. *See Gulf Life, supra,* 809 F.2d at 1523–1524 (declaratory judgment action by ERISA fiduciary to establish that it was not liable to a participant for severance benefits was not a suit to "enforce" the plan); *Transamerica, supra,* 811 F.2d at 1251–1253 (declaratory judgment action by ERISA insurer to establish that its policy did not provide double indemnity to a particular insured was not a suit to "enforce" the terms of the plan).[55] This court agrees with those

---

**53.** *Cf. Connecticut General Life Ins. Co. v. Cole,* 821 F.Supp. 193, 197 (S.D.N.Y.1993) (no jurisdiction under section 1132(a)(3) over fiduciary's declaratory judgment action seeking interpretation of its obligations under ERISA-covered policy because such action sought equitable relief).

**54.** For the sake of brevity, in this context, use of the term "ERISA" in this section shall mean the subchapter of that statute entitled "Protection of Employee Benefit Rights," as referenced in 29 U.S.C. § 1132(a)(3).

**55.** *See also Washington v. Humana Health Plan, Inc.,* 883 F.Supp. 264, 266 (N.D.Ill.1995) (suit for a legal determination that plaintiff was not required under the terms of a health benefit plan to reimburse that plan for monies collected from an

insurer was not one to "enforce" her rights under the terms of the plan) (citations omitted); *Woods, supra,* 1993 WL 462849, at *2, 1993 U.S.Dist. LEXIS 15871, at *5–*6 (and cases cited therein) ("[s]uit brought by a fiduciary solely to clarify its obligations to pay benefits under the plan is not one seeking to enforce the terms of the plan[]").

In addition, more recently, the Seventh Circuit in *Massey Ferguson Div. of Varity Corp. v. Gurley,* 51 F.3d 102 (7th Cir.1995), "cited *Gulf Life* and *Transamerica* for the proposition that a Plan fiduciary, who brings an action for a declaratory judgment that a participant is not entitled to certain benefits, does not thereby seek to "enforce" any provision of ERISA or the Plan." *Washington, supra,* 883 F.Supp. at 266 (citation

courts; and finds that the plaintiff fiduciaries, who are seeking a declaration that the Pension Plan Board correctly determined the amount of defendant Smith's pension under the terms of the Terminated Operations Plan and the Pension Plan, are not seeking to "enforce" any provision of ERISA or of the Pension Plan, as section 1132(a)(3)(B)(ii) requires.[56]

In short, although the plaintiff fiduciaries qualify as a party permitted to bring an action under section 1132(a)(3), because the ERISA cause of action which they allege is not of the type specifically provided for thereunder, plaintiffs do not have standing to bring such action. Accordingly, the defendants' motion to dismiss plaintiffs' first cause of action for lack of standing must be granted.[57]

### B. Amount of Pension

■ Having determined as a threshold matter that plaintiffs lack standing to bring their ERISA-based cause of action, regrettably, the court is not in a position to address the merits of such claim—that is, the amount of monthly pension benefits to which defendant Smith is entitled. Nevertheless, because that amount is at the heart of this controversy, the court offers a few passing observations regarding the same. First of all, even though, as the defendants note, "the last line of the arbitration award states that [j]urisdiction shall be retained for the pur-

pose of insuring compliance with this Award[,]" the court disagrees with the defendants that such language would require that the amount issue be referred back to the arbitrator. *See* Roberts Aff., exh. J thereto at 21. In the court's opinion, the amount issue could not properly be referred back to the arbitrator because the scope of his authority was not without limits. As extensively treated herein, the issue before the arbitrator was Smith's eligibility for a pension, and if so, what kind. The arbitrator's authority to decide that relatively narrow issue, as already discussed, stemmed, *inter alia*, from the plain language of the Pension Plan, allowing "any difference" as to an "applicant's right to a pension" to be subjected to the Plan's appeals procedure which culminated in arbitration. Nothing in either the Pension Plan or in the CBA granted the arbitrator the authority to decide the issue of the amount of such benefit, however. That omission is understandable given the broad discretion which the Pension Plan confers upon the Board with respect to administration of the pension benefits thereunder. Among other things, the Pension Plan specifically entrusts the Pension Plan Board with "determin[ing] the amount of benefits which shall be payable to any person in accordance with the provisions of the [Pension Plan] Agreement[.]" *Id.,* exh. B thereto at 29. Therefore, by the express terms of the Pension Plan, it is the Board and not the arbitrator

omitted). Although that statement is *dictum* because the Court there ultimately determined that it lacked appellate jurisdiction, it strongly suggests that if squarely presented with this issue, the Seventh Circuit would concur with the Ninth and Eleventh Circuits in this regard.

56. Before leaving this standing issue, the court is compelled to comment that its holding here today comports with the statutory scheme of section 1132 as a whole. In that regard, the *Gulf Life* Court soundly explained:

Congress stated in section 1132(a)(1) that a participant or beneficiary could bring a civil suit not only to recover benefits, but also "to clarify his rights to future benefits under the plan." ... Obviously, this section expressly acknowledges the right of participants/beneficiaries to seek a declaratory judgment; just as obviously, fiduciaries are omitted as parties that can bring such an action regarding benefits. This omission is significant.

Under Gulf Life's view, participants, beneficiaries and fiduciaries could bring a suit for declaratory judgment under section 1132(a)(3) to clarify a participant's/beneficiary's rights to benefits. That interpretation would usurp the language of section 1132(a)(1)—in which Congress limited such actions solely to participants and beneficiaries—and thereby render section 1132(a)(1) meaningless, or at least redundant. 809 F.2d at 1524 (citations and footnote omitted).

57. The defendants also suggest that if their motion to confirm the arbitration award is granted, then plaintiffs' ERISA cause of action is barred by arbitration and award. Defendants' Memorandum at 19, n. 31. While perhaps this is so, because defendants did not bother to analyze this issue, neither will the court.

which has the responsibility for determining the amount of pension benefits payable.[58]

In addition, again, assuming that plaintiffs did have standing to assert their ERISA cause of action, the court believes that the Pension Plan Board's determination of the amount of Smith's pension was not arbitrary and capricious. Accordingly, if the court were in a position to address the issue of the amount of defendant Smith's pension, which it is not, in all likelihood, it would not upset the Board's amount finding because it does not appear to be arbitrary and capricious.

## VII. Defendants Smith and the International Union

Because the court has determined that the arbitration award must be confirmed, there is no need to consider defendants' alternative argument that if the arbitration award is not confirmed, then, at the very least, the International Union and Mr. Smith should be dismissed as parties to this action; and thus the court declines to do so.

## VIII. Attorneys' Fees

■ There is one final issue for the court's consideration and that is the defendants' request for an award of attorney's fees. There are two branches to this aspect of defendants' motion. Defendants seek attorney's fees first under section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1). In the alternative, they rely on the court's "inherent power" to make an award of attorney's fees. Defendants' Memorandum at 28. Whether to award attorney's fees under ERISA lies solely within the court's discretion.[59] Among other things, the court declines to award attorney's fees under ERISA to defendants because although they arguably prevailed, they did not do so in terms of relief sought under ERISA. In a similar vein, the court also declines to rely upon its inherent power to award attorney's fees with respect to defendants' section 301 counterclaim because,

despite what defendants believe, the court is simply unable to find that the Company acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." *See Intern. Chemical Workers v. BASF Wyandotte Corp.,* 774 F.2d 43, 46 (2d Cir.1985) (internal quotations and citations omitted). Thus, defendants' motion is denied insofar as they are seeking attorney's fees.

To conclude, the motion for summary judgment by defendants on their counterclaim is granted; and the arbitration award of arbitrator Ronald F. Talarico in FMCS Case No. 90–19900 is hereby confirmed. Defendants' motion to dismiss plaintiffs' first cause of action for lack of standing is also granted, and such cause of action is hereby dismissed. Plaintiffs' motion for summary judgment is denied. The Clerk of the Court is directed to enter judgment in accordance with this decision.

IT IS SO ORDERED.

---

58. It is also doubtful whether there is any legal support for a remand under the particular facts of this case. *See Ottley, supra,* 819 F.2d at 376 (improper to remand the proceedings to the arbitrator for a determination of the parties' compliance).

59. Section 1132(g)(1) reads, in relevant part, as follows: "In any action under this subchapter ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1) (West 1985).